**CITY OF WACO, TEXAS, et al.,**
**Plaintiffs-Appellees**

v.

**James Dean BRIDGES, et al.,**
**Defendants,**

**James Dean Bridges, Percy Garcia and U.S.A., Defendants-Appellants.**

**No. 82–1138.**

United States Court of Appeals,
Fifth Circuit.

July 28, 1983.

Rehearings and Rehearing En Banc Denied Sept. 16, 1983.

Kenneth R. Hannam, George W. Shaffer, Corpus Christi, Tex., Tony E. Duty, Waco, Tex., for Bridges.

Charles L. Barrera, Alice, Tex., for Garcia.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, Carleton D. Powell, Libero Marinelli, Jr., Attys., Tax Div., Dept. of Justice, Washington, D.C., for U.S.

Keith Farr, Waco, Tex., for City of Waco.

Richard E. Gray, III, Asst. Atty. Gen., Austin, Tex., for State of Tex.

W.C. Haley, Waco, Tex., for McLennan County, Tex.

Before RUBIN, GARZA and WILLIAMS, Circuit Judges.

GARZA, Circuit Judge:

The City of Waco, Texas, brought this civil interpleader action to determine what party or parties were entitled to possession of some $500,000 cash unearthed on a ranch near Alice, Texas, and confiscated by Waco police following the arrest of appellant,

James Bridges, on January 31, 1977. The district court found that the money was payable to the McLennan County government pursuant to a Texas statute. We agree and affirm; however, in some respects, we affirm on different grounds. We address initially the facts of this unusual case.

### The Buried Treasure

In January 1977, appellants, fifteen-year-old James Dean Bridges and sixteen-year-old Percy A. Garcia, together with a friend dug up an ice chest containing approximately $500,000 in cash on the ranch of Bridges' father, James Hiroms, near Alice, Texas. Bridges testified at trial that he had accidentally discovered the money without knowing who had buried it, but in earlier statements to government agents had said that he had seen his father burying the money and that he believed the money was connected with his father's trafficking in marihuana. After digging up the money, the boys transferred it to two suitcases and drove to an Alice bus station where Bridges and Garcia boarded a bus for Dallas.

In Dallas, they registered at a hotel and visited various Dallas nightspots where they became acquainted with a man named Gilbert Bailey. They asked Bailey to purchase an automobile in their names, paid him $1,000 and purchased a 1977 Thunderbird. The automobile's title was in Bailey's name and had temporary dealer license plates.

From Dallas, the boys had intended to travel north to Chicago, but became "confused" and instead began driving south. While proceeding through Waco, Texas, they were stopped by city police for going through an intersection on a red light. At the time, neither one possessed a valid driver's license, and neither was able to provide a satisfactory explanation for Bailey's title ownership nor for the temporary license plates. In addition, they provided the police with conflicting accounts as to their identities and places of residence.

Suspecting that the car was stolen, the police arrested the boys on charges of driving the automobile without an operator's license. Although record testimony is in dispute as to the timing, the police conducted an inventory search of the automobile, apparently at the police station, where they discovered the money.[1] No search warrant nor consent had been obtained prior to the search.

On February 4, 1977, the Internal Revenue Service made a termination assessment for federal income tax in the amount of $330,705.00 against Bridges covering the period January 1 through February 1, 1977, pursuant to § 6851 of the Internal Revenue Code (26 U.S.C.). In response, Bridges filed a petition for redetermination of the deficiency with the tax court, containing the factual allegation that the money had been stolen. Bridges later filed an amended petition from which the allegation concerning the theft of the money was excluded. On February 4, the IRS served a notice of levy to the Waco police requiring the police to deliver to it such part of the seized money as was equal to the amount of the assessment. At about the same time, representatives of the government for the State of Texas advised the City of Waco that the State was also claiming the money.

On February 8, confronted with the conflicting claims of the IRS and the State, as well as those of Garcia and Bridges, and soon after news accounts of the find appeared, the City of Waco commenced a civil interpleader action in state court to determine ownership of the seized money. In March, pursuant to the IRS' motion, the case was removed to the United States district court. After removal, McLennan County, the county in which the City of Waco is located, was allowed to intervene to assert a claim for the money. The City of Waco also filed an amended interpleader

---

1. By the time the money was discovered by police, a portion had been spent. Eventually, $482,275.67 was deposited into the registry of the district court. Some $927.00 was retained as an exhibit. U.S. Marshals also took posses-

sion of a 1977 Ford Thunderbird purchased by the boys with money from the original find. For purposes of this opinion, we refer generally to the $500,000 as representing the funds on deposit in the registry of the court.

complaint joining Bridges' father as a defendant to which the father never responded.

The case proceeded to trial before a jury where the various parties each attempted to establish their entitlement to the money. Bridges and Garcia contended that they had discovered the money after digging in the spot where Bridges had previously observed an unknown person burying an ice chest. The boys argued that they were the last persons in lawful possession of the money, and their entitlement to it, therefore, was superior to anyone except the lawful owner who had not come forth. Characterizing the action as a criminal forfeiture proceeding, Bridges and Garcia challenged the admissibility of the money and their contradictory statements as to the origin of the money. The boys contended that the money had been discovered during an illegal search of the car and was, together with any other evidence obtained as a result of the illegal search, barred from introduction into the suit by the fourth amendment exclusionary rule.

The IRS took the position at trial "that the only issue before the Court [was] whether or not Mr. Bridges and Mr. Garcia were in lawful possession of the money." To this extent, the Government's claim was contingent upon a finding that Bridges and Garcia were entitled to the $500,000. On appeal, however, the IRS has proffered an additional argument, one not presented below, that even if Bridges and Garcia did not have lawful possession, they did have "a sufficient interest in the money for a tax lien to attach as a result of the assessment."

McLennan County and the State of Texas both took sides opposite Bridges, Garcia and the IRS below. Both contended that the boys never had lawful possession of the money, and thus, relying on separate Texas statutes, asserted diverse claims of entitlement. The State of Texas based its claim on the Texas escheat statutes, Tex.Rev.Civ. Stat.Ann. articles 3272 and 3272a (Vernon 1968), which provide that the State's right to possess and enjoy the property of an absent and unknown owner ripens after a period of seven years. The County urged that it was entitled to retain the funds pursuant to Tex.Code Crim.Proc.Ann. art. 18.17 (Vernon 1977) which provides that "all unclaimed or abandoned personal property . . . seized by any state or county peace officer in the State of Texas" should accrue to the county until the true owner appears.

Upon conclusion of the trial, the jury determined that Garcia and Bridges had obtained possession of the money "without the consent of the true owner, knowing or believing that the owner could be found." On the basis of that finding, the district court ruled that the boys' possession was unlawful; and consequently, no part of the money was payable either to them or to the IRS. The court further held that as between the State and County, the money was payable to the County pursuant to the Texas statute conferring ownership of unclaimed property seized by "any state or county peace officer." The court also held that the search of the suitcase containing the money was unconstitutional,[2] but that the exclusionary rule need not be applied if the police in good faith believed that their search did not violate constitutional requirements. The court ruled that the police, in opening the suitcases, had acted in good faith because state law precedent allowed inventory searches of suitcases, and at the time there was no contravening federal law precedent. These appeals followed. We now consider the claims of each of the parties.

### Finders Keepers, Losers Weepers?

Turning first to the errors asserted by Bridges and Garcia, we must initially deter-

---

**2.** Our holding, *infra,* that the exclusionary rule is not applicable in this civil action does not necessitate our passing on the issue of the constitutionality of the search. We note, however, that the Supreme Court's intervening decisions in *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) and most recently in *Illinois v. LaFayette,* —— U.S. ——, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) case some doubt on the lower court's finding.

mine if the district court erred in its application of the exclusionary rule to this proceeding. For different reasons, we conclude that the court properly refused to exclude the evidence of the money and the boys' statements from introduction at trial.

Throughout this proceeding, Garcia and Bridges have characterized this action as more akin to a quasi-criminal forfeiture proceeding rather than a civil interpleader action. We disagree with this characterization.

Tex.Code Crim.Proc.Ann. art. 18.18 (Vernon 1977) provides for the forfeiture of contraband. In this case, however, neither the State of Texas, McLennan County, nor the City of Waco have ever claimed that the money in dispute was contraband nor have they instituted or taken any action pursuant to statute to forfeit the money. Indeed, only Garcia and Bridges have ever alleged the money to be contraband, a position which they later refuted. The record establishes that Bridges and Garcia, together with their possessions, were taken into police custody after the boys were arrested for various traffic violations. Only when the boys admitted shortly after arrest that the money was stolen did the Waco police take possession of the money by authority of Tex.Code Crim.Proc.Ann. art. 47.01 (Vernon 1979) which provides that "an officer who comes into custody of property alleged to have been stolen must hold it subject to the order of the proper court or magistrate." After an assortment of claims and the growth of publicity about the find, the City of Waco brought this civil interpleader action. The record does not support Bridges' and Garcia's claim that this action constituted a criminal forfeiture action.

Since we are not faced with a criminal or quasi-criminal forfeiture proceeding, but rather an action purely civil in nature, we need not address the legality of the search as the criminal law exclusionary rule is not thus applicable. In *Jonas v. City of Atlanta*, 647 F.2d 580 (5th Cir.1981), this court followed the rationale of the Supreme Court of the United States in finding that the exclusionary rule, whose origin rests in the fourth amendment, was not generally applicable in civil cases. We stated:

> We start with the proposition that the seizure of evidence in violation of the Fourth Amendment does not always preclude use of the evidence at a civil trial. Indeed, whether the exclusionary rule may ever bar the introduction of evidence in a civil trial is uncertain. "In the complex and turbulent history of the rule, the [Supreme] Court never has applied it to exclude evidence from a civil proceeding, state or federal." *United States v. Janis,* 428 U.S. 433, 447, 96 S.Ct. 3021, 3028–3029, 49 L.Ed.2d 1046 (1976).

647 F.2d at 587 (footnote omitted).

For the exclusionary rule to ever be applicable in an action of this nature, the deterrent benefit of the exclusion must outweigh the detriment to the public interest in providing fact finders with all relevant testimony. *See id.,* 647 F.2d at 587. In this case, the deterrent benefit justifying application of the rule would in no way be effectuated. Assuming the search was in fact illegal, the governmental entity responsible for violation, the City of Waco, would in no way be deterred since they make no claim to the money and, except for their role in bringing this interpleader action, are not a party to it. We do not believe, therefore, that the exclusionary rule is applicable; and on these separate grounds, we find no error in the district court's admission of such evidence.

Our finding that this action is more akin to a civil action rather than a quasi-criminal action similarly disposes of the second claim raised by Garcia and Bridges—that the district court erred in adopting a "preponderance" burden of proof rather than a "reasonable doubt" standard. It is evident that the former, not the latter, burden is applicable to a civil action.

Finally, Bridges and Garcia allege that the district court erred in the form in which it submitted special issues to the jury in that such issues did not require the jury to determine whether the property discovered by the boys was abandoned. Failure

to submit an issue of abandonment to the charge of theft can constitute reversible error. *See United States v. Shackelford,* 677 F.2d 422 (5th Cir.1982). We find no error, however, in the instruction.

■ Tex.Penal Code Ann. § 31.03 (Vernon 1974) defines "theft" and "unlawful appropriation." When an individual discovers property, he is guilty of theft if he "forms the intent to appropriate it, and does so, knowing and believing that the owner can be found." *Williams v. State,* 160 Tex.Cr.App. 330, 268 S.W.2d 670, 672 (1954). Consistent with Texas law, the court submitted the following special issues to the jury which were answered as follows:

> Question No. 1: Do you find from a preponderance of the evidence that James Dean Bridges intended to exercise control over the money in question, and did so, without the consent of the owner, knowing or believing that the owner of the money could be found? Answer "We do" or "We do not."
>
> We, the jury, answer we do.
>
> If you have answered Question No. 1 "We do not"; then answer Question No. 2. Otherwise, do not answer Question No. 2.
>
> Question No. 2: Do you find from a preponderance of the evidence that the money in question was "mislaid" at the time James Lee Bridges and Percy Garcia dug it up? You are instructed that the term "mislaid" means money which the owner intentionally places where he can again resort to it and then forgets where he placed it. Answer, "We do" or "We do not."
>
> We the jury answer ⸻.

In special question Number 2, the court obviously considered "mislaid" to be synonomous with "abandoned property." The jury's affirmative finding on question Number 1 negated the question of abandonment since the issue of the status of the property had been resolved against Bridges and Garcia through the jury's determination that it had been stolen. The court did not err in the manner in which it submitted the special issues to the jury. Judgment denying the claim of Bridges and Garcia to the money is, therefore, affirmed.

### Is Possession Really Nine-Tenths of the Law?

■ Having ascertained that the money was stolen, the district court was next required to determine whether the County or State was entitled to possession thereof. The parties assert that if the money is disposed of pursuant to Tex.Code Crim. Proc.Ann. art. 18.17 (Vernon 1977) McLennan County will obtain possession of the money. Article 18.17 provides that unclaimed personal property "seized by any *state* or *county* peace officer in the State of Texas" shall accrue to the county until the true owner appears. On the other hand, if art. 18.17 is inapplicable, then the money is subject to disposition to the State pursuant to Texas escheat statutes, Tex.Rev.Civ.Stat. Ann. articles 3272 and 3272a (Vernon 1968). The applicability of art. 18.17 is contingent upon whether the seizing officers, that is, the City of Waco police officers, are "state" officers within the meaning of art. 18.17. We are persuaded by the district court's reasoning that in fact they are and, therefore, we affirm.

We agree with the district court that the language of art. 18.17 referring to "state or county peace officers" is not used in reference to the *employers* of the officers, a construction which the State urges, but rather is used in reference to the *source* of their power. As the court quite properly indicated, a statute should be construed to consider the consequences of a particular construction and presumably to effectuate a "just and reasonable result" as intended by the legislature. *Parr v. State,* 575 S.W.2d 522, 525 (Tex.Cr.App.1978); *Cole v. Texas Employment Commission,* 563 S.W.2d 363, 367 (Tex.Civ.App.—Fort Worth 1978, writ dism'd). If we accept the state's view that seizures by a *city* police officer are not within art. 18.17, then the result would be anomalous. Property seized by an officer employed by the state would qualify under art. 18.17 and would ultimately inure to the benefit of the county. If the same proper-

ty, however, were seized by an officer employed by a city, it would be disposed of under the Texas escheat statutes and would ultimately inure to the benefit of the state. Consequently, the state would profit because the seizing officer was not its own employee but rather that of a city. This factor together with the separate status of peace officer afforded the *county* sheriff and constable under Tex.Code Crim.Proc. Ann. art. 2.12 (Vernon 1977) more clearly explains why the state legislature separately recognized "state or county peace officers" in art. 18.17 and supports the court's construction of this provision as indicating the source of the peace officer's power. Since Waco police officers derive their authority from the state, art. 18.17 was correctly applied by the district court.

*Claims of the Internal Revenue Service*

The final issue before us involves the validity of the tax lien levied by the Internal Revenue Service against the fund. At trial, the IRS contended that it was entitled to levy on the money since Bridges and Garcia had "lawful possession" of it at the time of the assessment. The question of "lawful possession" having been resolved contrary to the Government's interests, the IRS now presents for the first time on appeal the contention that the taxpayer, notwithstanding his unlawful possession, "had a sufficient interest in the money for a tax lien to attach as a result of the assessment and thus for the government to be entitled to the amount of the assessment."[3] Counsel for the United States has conceded that this theory of law was not presented to the lower court. The record and lower court's dismissal of the Government's claim simultaneous to its finding against the taxpayer makes this fact evident. McLennan County urges, therefore, that this new theory be disregarded since the failure of the IRS to present it below prejudiced the manner in which McLennan County would have presented its case.

As a general rule, an appellate court will not consider a new issue raised for the first time on appeal for the purpose of reversing the lower court's judgment. *Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941); *General Utilities and Operating Co. v. Helvering,* 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154 (1935); *In re Novack,* 639 F.2d 1274, 1276 (5th Cir.1981) (and cases cited therein). There are several reasons for this rule. As a procedural matter, the trial court is the forum vested with the duty of determining issues of fact. Fairness to the parties requires that each party be allowed the opportunity to present all evidence and arguments relevant to the issues to be determined in the trial forum. *See Hormel v. Helvering, supra.* Still another reason justifying such rule is founded in the need to promote judicial economy. The burden and practical effect of multiplicitous trial and appeal of issues requires that all issues be raised at the trial level. *See Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358, 1364 (5th Cir.1983); *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1144 (5th Cir.1981), *cert. denied,* 455 U.S.

---

**3.** The IRS contends that even if Bridges and Garcia stole the money and were not otherwise in lawful possession, they exercised the requisite dominion or control over the property to support a tax levy. Their argument proceeds as follows.

The fact that funds are obtained in an illegal manner does not necessarily mean that such funds do not represent taxable "income" to the possessor. In *James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), the Supreme Court held that embezzled money in the hands of the embezzler is included within the category of illegally obtained income which is subject to the tax. The Court stated, "A gain constitutes taxable income when its recipient has such control over it, that, as a practical matter, he derives readily realizable economic value from it ...." 366 U.S. at 219–220, 81 S.Ct. at 1055–1056. *Accord, United States v. Rochelle,* 384 F.2d 748, 751–52 (5th Cir.1967), *cert. denied,* 390 U.S. 946, 88 S.Ct. 1032, 19 L.Ed.2d 1135 (1968) ("economic benefit" is the controlling factor in determining income). That Bridges and Garcia exercised control and received economic benefit from the money is undisputable. Accordingly, it is asserted that the Government's tax assessment is valid.

Under this theory, the primary issue tried below—the stolen nature of the money—is irrelevant from the standpoint of the Government.

1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982). Finally, the facilitation accorded appellate review by a lower court's consideration of the legal issues and judicial resolution of factual disputes commands that such a rule not be disregarded lightly. *See Helvering v. Wood,* 309 U.S. 344, 349, 60 S.Ct. 551, 553, 84 L.Ed. 796 (1946).

██ Such a rule, however, is not universal. As the Supreme Court stated in *Hormel v. Helvering, supra,* the rule barring appellate consideration of issues not raised below

> do[es] not announce an inflexible practice as indeed [it] could not without doing violence to the statutes which give to Circuit Courts of Appeals ... the power to modify, reverse or remand decisions not in accordance with law "as justice may require." There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below.

312 U.S. at 556–57, 61 S.Ct. at 721. The parameters of this exception have previously been identified by this court. Issues raised for the first time on appeal will not be considered absent a showing (1) that a pure question of law was posed and refusal to entertain such question would result in a miscarriage of justice, (2) that an interest of substantial justice was at stake, or (3) that there was no opportunity to object to an order upon its issuance. *In the Matter of First Colonial Corporation of America,* 693 F.2d 447, 449–50 n. 5 (5th Cir.1982); *In re Novack, supra,* 639 F.2d at 1276–77.

The Government contends that their present theory on appeal is purely legal in nature, is applicable to an undisputed set of facts and, if applied, promotes an important public policy that tax liabilities owing to the United States be paid. McLennan County refutes these claims. The County asserts that had the Government raised its present theory in the court below, the trial would have taken on a significantly differ-

ent outlook. First, it would have materially altered the alignment of the parties, the effect of which would have materially shifted the focus of the issue before the court. At trial, the primary issue was whether or not the money was in lawful possession of Bridges. McLennan County and the State contended it was not; Bridges, Garcia and the IRS contended it was. Resolution of the case turned on this issue. Under the Government's new theory, this issue is irrelevant.

More importantly, McLennan County contends that their presentation of evidence was materially prejudiced. The County asserts that had it been aware of the Government's new theory, it would have proffered evidence of a stipulation between the IRS and Bridges releasing him from tax liability in the event his interests in the money were terminated. The County argues that introduction of such a stipulation would have defeated the Government's claim since the validity of a tax lien rests upon a showing that taxes were in fact assessed. It is contended that the stipulation would have invalidated the tax lien, notwithstanding the Government's new theory. We also note generally that under Texas law, the release of the primary obligor, absent reservation as to other parties, may in some cases result in release of those parties owing through the primary obligor. *See generally,* 50 Tex.Jur.2d *Release* §§ 28–31.

██ We have previously stated that consideration of a new issue or legal theory for the first time on appeal requires the existence of "exceptional circumstances." *Payne v. McLemore's Wholesale & Retail Stores, supra,* 654 F.2d at 1144; *D.H. Overmyer Co. v. Loflin,* 440 F.2d 1213, 1215 (5th Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971). The burden of establishing exceptional circumstances clearly rests on the party asserting the new issue. In this case, the United States has not met its burden. It has offered no reason why the theory it offers today was not presented below, even though it admits that its present theory is "consistent," albeit different, from that which it previously urged.

Furthermore, if additional facts would have been developed in the trial court had the new theory been presented there, we are required to apply the general rule barring consideration of new issues on appeal. *See id.,* 645 F.2d at 1145; *Higginbotham v. Ford Motor Co.,* 540 F.2d 762, 768 n. 10 (5th Cir.1976). McLennan County alleges the existence of the Government-taxpayer stipulation is a fact which would have been developed below. It is clear that the Government's new theory would have shifted the emphasis on the primary issue before the lower court. These considerations convince us that the United States has waited too late into the day to urge new grounds for reversal. Although a substantial sum of money is involved, the nature of this action and posture of this case (that is, the tardiness of the IRS) does not lead us to conclude that something as manifest as a miscarriage of justice would result from our refusal to consider the Government's new theory for the first time on appeal.

Finding no grounds for error, the judgment of the district court awarding the money to McLennan County, Texas, is AFFIRMED.