## CIRCUIT COURT OF HENRICO COUNTY

In re $128,464.04

June 27, 1986

Case No. 1809

By JUDGE L. PAUL BYRNE

In the trial of this interpleader action on May 20, 1986, through May 22, 1986, which resulted in a mis-trial due to the conduct of counsel, which was considered by this Court to be improper, all of the evidence was presented that is necessary for the disposition of the issues now before the Court. Counsel have agreed that no further evidence is necessary and the transcript of the trial record in that trial has been made a part of this record.

The issue before the Court raised in a Motion in Limine filed by the claimant, George Ehlers, is whether the statements obtained from him by the officers and agents of the adverse claimants, Henrico County, Amtrak and the Commonwealth of Virginia, in violation of his constitu-tional rights, are inadmissible in this civil interpleader action because their use would violate the constitutional policy of deterrence and allow proof of a substantive issue by legally non-probative evidence.

In the resolution of this issue, the Court has been unable to find any Virginia cases directly in point nor have counsel for the various claimants been able to cite any that would be beneficial to the Court. So, this may well be a case of first impression in the Commonwealth.

For the purpose of brevity, the claimants will be

referred to as "Ehlers, Henrico, Amtrak and the Commonwealth."

On August 28, 1983, Ehlers was a passenger on Amtrak's northbound train # 88 travelling through the State of Virginia. He was the sole occupant of compartment # 3 on the train. Amtrak's agents received information that, under the drug interdiction profile, Ehlers was suspected of transporting illegal drugs. This information was relayed to Henrico's police interdiction team and plans were made to board the train and attempt to verify the information received when it arrived in Henrico County.

At approximately 3:40 a.m., the train arrived and Henrico's police interdiction team boarded the train with Amtrak's agent and a drug dog named Kennedy. The dog alerted on Ehlers' compartment and he was awakened, ordered to step into the hallway and produce his luggage, which consisted of four bags. Ehlers complied.

At approximately 4:00 a.m., Ehlers was handcuffed and removed from the train and he and his luggage were transported to Henrico's Public Safety Building. At the Public Safety Building, the restraints were removed and Ehlers was placed in a locked interview room at approximately 4:30 a.m.

Subsequently, at 4:59 a.m., Henrico officers Camp and Mann entered the interview room and advised Ehlers that they intended to search his luggage and that the search could be accomplished in two ways, i.e., (1) he could consent or (2) the police would obtain a search warrant. Ehlers was advised, also, of his "Miranda" rights. Ehlers refused to give his consent and invoked his constitutional right to counsel.

Henrico officers Camp and Mann then left the interview room and at 8:10 a.m. obtained a search warrant and completed the search of Ehlers's bags at 8:45 a.m. Thereafter, at approximately 9:00 a.m., Officers Camp and Mann returned to the interview room and initiated further interrogation of Ehlers with regard to the money found in his bags which is the subject of this action. When asked about the money, Ehlers, among other statements, replied, "I don't know what you are talking about." He was then advised again of his Miranda rights and again he invoked his right to counsel. At no time between the hours of 4:59 a.m. and 9:00 a.m., was Ehlers offered an opportunity to obtain or to have counsel present.

In the meantime, Henrico officer Shaw had called the Internal Revenue Service and reported the discovery of $255,000.00 plus, in cash, in Ehlers's luggage. The Internal Revenue Service, on August 29, 1983, filed a Notice of Levy under a jeopardy assessment for income taxes on the money in the name of "George Ehlers, as possessor of certain cash" (Ehlers Exhibit A) and received from Henrico authorities the sum of $127,190.00.

No drugs or contraband of any nature were found in Ehlers's luggage. No charges were placed against Ehlers by Henrico or the Commonwealth. Henrico retained his luggage, train ticket and the money in question and he was allowed to leave the Public Safety Building sometime between the hours of 10:00 a.m. and 11:00 a.m.

Under the facts in this case, it is abundantly clear that Ehlers was under *arrest* or in *custodial detention* by Henrico police officers and Amtrak agents from the time he was handcuffed and removed from the train at approximately 4:00 a.m., until his subsequent release by the authorities between 10:00 a.m. and 11:00 a.m., a period of approximately six and a half hours, and at all times he was subjected to *custodial interrogation*. See *Miranda* v. *Arizona*, 86 Sup. Ct. 1602 (1966); *U.S.* v. *Mendenhall*, 100 Sup. Ct. 1870, 1877 (1980); and *Rhode Island* v. *Innis*, 100 Sup. Ct. 1682, 1689 (1980).

It is conceded by the adverse claimants, Henrico, Amtrak and the Commonwealth, that Ehlers had possession of the money in issue at the time he was taken into custody from the Amtrak train; that no criminal charges were ever placed against Ehlers; that no illegal drugs were found in his luggage; and that no criminal nexus can be established as to the money in his possession. It follows that under the law Ehlers is clothed with a presumption of entitlement and Henrico, Amtrak, and the Commonwealth have the burden of showing that by his conduct and actions Ehlers has *voluntarily* abandoned his entitlement to the money and there is no burden on Ehlers to come forward with additional evidence of ownership nor is he required to show the origin of the funds in his possession.

In *U.S.* v. *Wright and Boyd*, 610 F.2d 930, (D.C. Cir. 1979), acting under a search warrant issued by a U. S. Magistrate, Metropolitan Police Officers seized $1500.00 from the person of Wright and $600.00 from a dresser in a room used or occupied by Wright and Boyd and drugs,

drug paraphernalia, weapons and money from a certain residence. Wright, Boyd and five other persons present in the building were arrested. Thereafter, Wright and Boyd were indicted for drug offenses. After all charges against them arising out of the search were dismissed by the District Court, Wright and Boyd filed a motion for the return of the $2100.00 seized.

There, as in the instant case, the government contended that Wright and Boyd had an obligation to prove that they were the owners of the money. The Court of Appeals, citing several cases, rejected this argument, holding "The general rule is that seized property, other than contraband, should be returned to its rightful owner once criminal proceedings have terminated." *id*, 935; and:

> The seizure of property from someone is prima facie evidence of that person's entitlement, particularly when the seized property is money-negotiable instruments difficult to identify and trace. The whole thrust of the cases that we have cited is that when property is seized from a person, the Court must return it to that person when it is no longer needed by the government. The Court is obligated to restore the *status quo ante*. Unless there are serious reasons (presented by the government or adverse claimants) to doubt a person's right to the property seized from him he need not come forward with additional evidence of ownership. *id*, 939.

It is fundamental under *Miranda* and its progeny that once a person, who is in custody and subjected to custodial interrogation, having been advised of his *Miranda* rights, invokes his right to silence or his right to counsel such right must be *scrupulously honored* and all further questioning must cease, unless and until such person, knowingly and intelligently, freely waives such rights.

Viewing the evidence in the light most favorable to Henrico, Amtrak and the Commonwealth, the Court finds that Ehlers at 4:59 a.m. in the Public Safety Building of Henrico County, after being advised of his *Miranda* rights, clearly invoked his right to counsel. In support of the argument of the voluntariness of the statements made by Ehlers four hours later, the adverse claimants

proffered the testimony of Henrico officers Camp and Mann. Upon direct examination, Officer Camp's testimony was somewhat equivocal when he prefaced his answers with "generally speaking" and "I believe" Ehlers stated, "I think I ought to have an attorney." (Vol. 1, Trial Tr. beginning at page 124). However, on cross-examination, he unequivocally admitted that Ehlers had asked for an attorney. (Vol. 1, Trial Tr. page 125, line 7). However, Officer Mann's testimony was direct and unequivocal, "Ehlers stated he didn't want to discuss anything further with us without talking to an attorney." (Vol. 1, Trial Tr. page 214).

It is uncontradicted that Ehlers was detained in the locked interview room after being advised of his *Miranda* rights from 4:59 a.m. to 9:00 a.m. when Officers Camp and Mann returned. He was allowed to leave only to go to the bathroom in the company of a police officer.

In determining whether the statement relied upon by Henrico, Amtrak and the Commonwealth, made by Ehlers at approximately 9:00 a.m. or four hours after he had invoked his right to counsel, was voluntary or not, we must again look to the testimony of Officers Camp and Mann in the context of the criminal setting in which Ehlers is found. It is uncontradicted from the testimony of Camp and Mann that they returned to the interview room for the *sole purpose* of eliciting statements from Ehlers with regard to the money they had discovered in his luggage. There is a conflict as to whether he was again advised of his *Miranda* rights and the Court resolves that conflict against the adverse claimants, but, it is of no consequence because, even if you believe Officer Camp, it was not done until after the interrogation was completed.

The second interrogation of Ehlers, four hours after he invoked his right to counsel is a clear violation of the constitutional safeguards established by *Miranda*. There is no evidence that Ehlers was ever offered the services of an attorney or even afforded the opportunity to obtain one. In fact, all of the evidence is to the contrary. Further, the evidence is uncontradicted that the second interrogation was not initiated by Ehlers and that the questioning was initiated by Camp and Mann for the sole purpose of eliciting statements regarding the money found in Ehlers's luggage. The statement by Officer Mann that they were not investigating any criminal

activity at the time is incredulous. The claimants will not be allowed to attempt to sanitize the context of their criminal interrogation by saying they are now conducting a simple question and answer game.

In *Rhode Island* v. *Innis*, 100 Sup. Ct. 1682, *supra*, the Supreme Court restated the rule in Miranda regarding the invocation of the right to counsel at page 1688:

> Once warnings have been given the subsequent procedure is clear. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

In clarifying the meaning of interrogation under *Miranda*, the Supreme Court in *Innis* continued at page 1689:

> We conclude that *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that *the police should know are reasonably likely to illicit an incriminating response from the suspect.* The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. (Italics added.)

In *U.S.* v. *Clark*, 499 F.2d 802 (4th Cir. 1974), the Court of Appeals in determining the standard of voluntariness of a statement made by Clark at the instigation of FBI agents after having previously invoked his right to counsel stated at page 806:

> Presented for determination here is the question whether the Fifth and Sixth Amendment rights of an accused, who had previously indicated his desire to consult with an attorney were violated when he was interviewed at the insistence of government agents without the presence of an attorney. The single issue underlying the purported waiver of each of those constitutional rights is whether the record supports the conclusion that such waiver was *voluntarily* made. The standard of voluntariness is not whether the accused was coerced in traditional terms but whether appropriate measures were taken to safeguard his rights and insure that his statements were the product of free choice. (citation omitted.)

Applying these principles to the case at bar, this Court holds that the second questioning of Ehlers was custodial interrogation; that Ehlers did not voluntarily waive his right to counsel and to remain silent; that his statements regarding the money were the result of impermissible conduct by the Henrico Police and Amtrak agents and that such statements were not voluntary. Clearly, they would be inadmissible in a criminal case.

We now reach the crucial issue in this case. Are such *involuntary* statements, elicited in violation of Ehlers's constitutional rights, inadmissible in a civil interpleader action where the adverse claimants, Henrico, Amtrak and the Commonwealth seek to use such statements to prove a *voluntary* abandonment of the property in question?

As the Court stated previously, it has not been able to find any cases in point in Virginia nor have counsel been able to cite any Virginia cases beneficial to the Court. Therefore, the Court must look to other jurisdictions for assistance.

In reaching its decision the Court must weigh the deterrent benefit of the exclusion against the detriment

to the public interest in providing fact finders with all relevant testimony. *Jones* v. *City of Atlanta*, 647 F.2d 580, 587 (5th Cir. 1981).

While it has been held that statements obtained in violation of a person's constitutional rights are admissible in a civil proceeding, the Federal Courts have established an exception to this view when the governmental entity that illegally obtained the evidence is a party to the subsequent civil action and would profit from the misconduct of their agents or employees at the expense of the constitutional rights of citizens. Annot. 43 A.L.R.3d 1375 (1972). As stated by Ehlers in his argument, if it were a crime to carry large sums of money in a person's luggage, he would be guaranteed the full panoply of the constitutional safeguards designed to deter the precise kind of official misconduct found in this case.

The majority of cases in which the Courts have applied the exclusionary rule in civil litigation involves civil liability for Federal Income Taxes based on illegally obtained evidence. The reasoning of the Courts is precisely that explained by the Supreme Court in *U.S.* v. *Janus*, 96 Sup. Ct. 3021 (1976), and relied upon by the 7th Circuit in *Romanelli* v. *The Commissioner of Internal Revenue*, 466 F.2d 872 (7th Cir. 1972), i.e., the need to deter governmental misconduct and to protect judicial integrity. In defining judicial integrity, the Court in *Janus*, *supra*, note 35 at 3034, stated that judicial integrity does not mean that the Courts must never admit evidence obtained in violation of constitutional rights. "The primary meaning of 'judicial integrity' in the context of evidentiary rules is that the Court must not commit or encourage violations of the Constitution."

In *Romanelli* v. *Commissioner of Internal Revenue*, *supra*, the Court held that a statement made by a tax payer in violation of his *Miranda* rights could not be used against him in an action by the Federal Government to establish civil liability for failure to pay taxes. The Court noted that inadmissibility in a prosecutor's case in chief in a criminal setting was not the only sanction that could be imposed for violation of an individual's Fifth Amendment rights. In holding the statement inadmissible, the Court concentrated on the deterrent effect of exclusion on police conduct in the particular circumstances:

The agents were proceeding at least in the form of preliminary stages of a criminal prosecution, obtaining and executing a search warrant and presuming to restrain Romanelli's liberty for the purpose of interrogation about matters which could as well involve criminal as well as civil liability. They derived substantial advantage from use of their status as law enforcement officers. To permit them so proceeding, to infringe upon Romanelli's constitutional protection against self-incrimination, to an extent that the right to use his statements to a criminal charge was forfeited, but to award the advantage of using his statements in establishing civil liability seems *unwholesome and an abuse of power.* At page 79 (italics added).

The U.S. Supreme Court has not dealt with the question of the admissibility of a statement obtained in violation of a party's Fifth and Sixth Amendment Rights in a subsequent civil proceeding involving the same governmental entity. In the context of the Fourth Amendment, however, the Court has held that evidence illegally seized by *State authorities* may be admitted in a civil proceeding initiated by the *Federal government. U.S.* v. *Janus, supra.* It is noted that *Janus* was cited by counsel for the adverse claimants for the proposition that illegally obtained evidence may always be admitted in a civil proceeding. A careful reading of the case does not show that it stands for such a proposition. As stated in Ehlers's argument, crucial to Justice Blackmun's opinion was the absence of a showing that Federal officers took part in the illegal search. The Court indicated that the evidence may not have been admissible if it could be shown that Federal agents participated in the illegal search.

In *Janus*, the Court balanced the deterrent effect of excluding the evidence against the societal interest in criminal prosecutions and found that the lack of involvement of Federal officials in the illegal search rendered any deterrent effect caused by excluding the evidence too attenuated. The facts in the instant case are inapposite in that the adverse claimants, Henrico, Amtrak and the Commonwealth equally participated and

are charged with the impermissible conduct of their agents and officers in the violation of Ehlers's constitutional rights.

In its research, the Court has found that lower Federal Courts, before and after the *Janus* decision, have held that the deterrence of government misconduct requires the exclusion of evidence seized in violation of an individual's Fourth Amendment Rights in a civil action initiated by the *same* sovereign. See *U.S.* v. *Janus, supra,* citing cases in which Federal Courts have excluded evidence in civil actions on grounds of Fourth Amendment violations. This Court, after reading *Janus,* is of the opinion that it does nothing to denigrate the value of these rulings but, rather, by its reasoning, affirms their validity.

The case of the *City of Waco, Texas* v. *Bridges,* 710 F.2d 220 (5th Cir. 1983), cert. denied, 465 U.S. 1066, also has been cited in oral argument by the adverse claimants in support of the admissibility of the statements allegedly made by Ehlers. This case involved an interpleader action in which the claimants included the County, the State, the Federal government, and two teenage boys from whose car the money in question had been found in the course of an illegal search. The Court applied the balancing test of *Janus,* and held that the deterrent benefit of exclusion did not outweigh the "detriment to the public interest in providing fact finders with all relevant testimony." (at page 225). Paramount in the Court's decision was the fact that the City, whose officers had conducted the illegal search had not asserted any claim to the money in the interpleader action. It follows, by implication, that the City would have been prohibited from attempting to establish entitlement to the money in a civil action precisely because the money was obtained by an illegal search and seizure.

This Court is of the opinion that *Romanelli, supra,* and the analogous Fourth Amendment cases make it clear that evidence obtained by a violation of a citizen's Fifth Amendment right should be excluded in a subsequent civil proceeding where the government entity responsible for the constitutional violation participates and would profit by its admissibility. To hold otherwise would be to encourage governmental misconduct by allowing the government to benefit from civil litigation when their unconstitutional acts prohibit successful criminal prosecu-

tion. The argument for excluding the evidence under circumstances in which an individual's Fifth Amendment rights have been violated is even stronger than it is under the Fourth Amendment. As stated by the Court in *Janus, supra,* the exclusionary rule under the Fourth Amendment operates to exclude "unquestionably accurate evidence." In contrast, a statement obtained in violation of an individual's Fifth Amendment rights does not bear the same unquestionable reliability, and exclusion does not deny the parties such unequivocal evidence.

In view of the above, this Court holds that evidence obtained in violation of constitutional rights is not absolutely admissible in a civil setting simply because of the nature of the forum. Rather, important questions of "judicial integrity" are raised where parties seek to gain from the admission of illegally obtained evidence though they participate in the rights violation and would clearly be estopped from relying on the same evidence in a criminal setting. In order to preserve the policy of deterrence of constitutional violations and judicial integrity, the statements of Ehlers obtained by the adverse claimants, Henrico, Amtrak and the Commonwealth, will be excluded.

Having thus concluded, the Court does not find it necessary to reach a decision on the probative value of such involuntary statements.

Accordingly, there being no other evidence in support of the adverse claimants' position of voluntary abandonment of the money in question, and no other claims having been asserted, the Court holds that Ehlers' petition for return of the money interpleaded in this action should be granted.