759 F.2d 412
 Stephen C. CRANE, on Behalf of himself and others similarly
situated, Plaintiff-Appellee-Cross Appellant,
v.
STATE OF TEXAS, Defendant-Appellant,
v.
COUNTY OF DALLAS, Ben Ellis, John Orvis, Mike Schwille,
Berlaind Brashear and Chuck Miller,
Defendants-Appellants-Cross Appellees,
v.
Henry WADE and L. E. Murdoch, Defendants-Appellees.
 No. 83-1650.
 United States Court of Appeals,
Fifth Circuit.
 May 2, 1985.
Rehearing and Rehearing En Banc Denied July 22, 1985.
 
 Earl Luna, Dallas, Tex., for Ellis et al. and Dallas County.
 Jim Mattox, Atty. Gen., Mary F. Keller, Lawrence J. King, Asst. Attys. Gen., Austin, Tex., for State of Texas.
 Peter Lesser, Johnston & Larson, Douglas R. Larson, Dallas, Tex., for Crane.
 Sue L. Lagarde, Asst. Dist. Atty., Dallas, Tex., for Henry Wade & Larry Murdoch.
 Appeals from the United States District Court for the Northern District of Texas.
 Before GEE, WILLIAMS and JOLLY, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 On behalf of himself and others similarly situated, Stephen Crane brought an action pursuant to 42 U.S.C. Secs. 1983, 1988, and the common law of Texas, against the State of Texas, Dallas County, the judges of the Dallas County Criminal Courts, the Dallas County Clerk, the Dallas County Criminal District Attorney, the City of Dallas, and divers Dallas police officers. The gravamen of his complaint was that Dallas County regularly issued misdemeanor capias without a finding of probable cause by a neutral and detached magistrate in violation of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution and Article 23.04, Tex.Code Crim.Proc.Ann. (Vernon). Alternatively, he alleged that articles 23.01 and 23.04 of the Tex.Code Crim.P. were unconstitutional if they allowed a clerk to issue a capias on nothing more than a District Attorney's information and affidavit. Crane sought declaratory and injunctive relief as well as monetary damages.
 
 
 2
 In an Order filed April 30, 1981, the trial court certified maintenance of the case as a class action and granted the motion to dismiss of the State of Texas on the ground of the State's Eleventh Amendment immunity from suit in the federal courts. The trial court also denied the judges' motions to dismiss on the ground that their common law judicial immunity did not extend to Sec. 1983 suits seeking equitable relief.
 
 
 3
 The legality of the challenged practices was considered separately from Crane's entitlement to damages. In an order filed November 30, 1981, the trial court concluded that under Texas law a determination of probable cause by a neutral magistrate must precede the issuance of a valid misdemeanor capias; the Dallas practice therefore violated Texas law. Defendants were invited to submit proposals for reform of the Dallas County misdemeanor capias system. By February 4, 1982, defendants had done more than submit proposals; they had changed the County system to ensure that misdemeanor capias issued only after the requisite finding of probable cause by a properly neutral magistrate. The trial court therefore denied Crane's request for injunctive relief.
 
 
 4
 The remaining issues of damages and attorneys' fees were tried to a jury. The jury awarded Crane $40,000 in compensatory damages to be paid by the County and the District Attorney. It found that District Attorney Wade, as legal advisor to the County, knew or should have known that the County capias system infringed Crane's established constitutional rights, but that the police, the City of Dallas, and Murdoch, the County Clerk, had acted in good faith and without knowledge of the constitutional infringement.
 
 
 5
 The court held, in a memorandum opinion filed March 11, 1982, that the County was immune from liability for damages because the illegal practices were not a "county policy or custom." The District Attorney was immune from liability for damages because he was primarily responsible to the State and breached no duty he owed to the County. Crane thus took nothing. He was, however, awarded attorneys' fees as a "prevailing party" under 42 U.S.C. Sec. 1988. The award was made against the State of Texas because defendants were "wearing their state hats" when they performed the acts complained of. The trial court modified its original order of September 8, 1982; and, in a memorandum opinion filed July 26, 1983, reduced the fees to be awarded Crane. The reduction was based on Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). All parties appeal from those aspects of the trial court's holdings adverse to themselves.
 
 Facts
 
 6
 The facts underlying this action are simple and undisputed. A lawyer with whom Crane shared office space listed Crane, without Crane's knowledge or consent, as an initial director of Crystal Theater, Inc., in the corporation's Articles of Incorporation. The Crystal Theater showed dirty movies in Dallas. Dallas police visited the theater and determined its movies to be obscene. Proceeding solely on the basis of the Articles of Incorporation, and without further investigation, the Dallas police prepared a case report charging Crane with distribution of commercial obscenity, a misdemeanor. The police sent the report to the Dallas County Criminal District Attorney's office. The District Attorney's office decided to prosecute Crane and prepared an information and accompanying affidavit charging him with the misdemeanor offense. The information and affidavit were filed with the Dallas County Clerk's office. The Clerk's office typed Crane's name on a writ of capias form, thereby authorizing Crane's arrest, and gave the form to the police, who duly arrested Crane. He spent about four hours in the Dallas County jail before being released on bail. The charges against him were later dismissed for insufficient evidence at the request of the District Attorney's office, which had belatedly discovered Crane's lack of connection with the theater. This suit followed.
 
 Eleventh Amendment Immunity
 
 7
 Dallas County contended at trial and contends on appeal that its status as a state agency entitled it to Eleventh Amendment[1] immunity from federal suit, and therefore to dismissal for lack of jurisdiction. The trial court found it unnecessary to decide this question, and declined to do so. This was error. Because the Eleventh Amendment acts as a jurisdictional bar, Edelman v. Jordan, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974); Laje v. R.E. Thomason General Hospital, 665 F.2d 724, 726 n. 2 (5th Cir.1982), an assertion of Eleventh Amendment immunity cannot be ignored, for a meritorious claim to that immunity deprives the court of subject matter jurisdiction of the action. Dallas County's claim of Eleventh Amendment immunity as an arm or agent of the State of Texas, Chiz's Motel v. Mississippi State Tax Com'n, 750 F.2d 1305, 1307 (5th Cir.1985); United Carolina Bank v. Board of Regents, 665 F.2d 553, 557 (5th Cir.1982), thus put in question the trial court's jurisdiction over the subject matter of Crane's action against the County; it was incumbent upon the trial court to settle the question before proceeding further. The error was harmless, however, in view of our conclusion that the immunity to federal suit granted by the Eleventh Amendment to the State of Texas does not extend to Dallas County.
 
 
 8
 The Supreme Court has "held that the Eleventh Amendment does not apply to 'counties and similar municipal corporations.' " Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, ---- n. 34, 104 S.Ct. 900, 920 n. 34, 79 L.Ed.2d 67, 93 n. 34 (1984), quoting Mt. Healthy City School District v. Doyle, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). In Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), the Supreme Court stated that it "has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power.' " 440 U.S. at 401, 99 S.Ct. at 1177, citing in support Mt. Healthy; Moor v. County of Alameda, 411 U.S. 693, 717-721, 93 S.Ct. 1785, 1799-1802, 36 L.Ed.2d 596 (1973), and Lincoln County v. Luning, 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890). The Lincoln Court explicitly rejected a county's assertion of Eleventh Amendment immunity:
 
 
 9
 [I]t may be observed that the records of this court for the last thirty years are full of suits against counties, and it would seem as though by general consent the jurisdiction of the federal courts in such suits had become established. But irrespective of this general acquiescence, the jurisdiction of the circuit courts is beyond question. The Eleventh Amendment limits the jurisdiction only as to suits against a State.
 
 
 10
 133 U.S. at 530, 10 S.Ct. at 363. Although the Lincoln Court acknowledged the Eleventh Amendment as a bar to suits "in which the State is a real, if not a nominal, defendant," it did not place suits against counties in this category:
 
 
 11
 [W]hile the county is territorially a part of the State, yet politically it is also a corporation created by and with such powers as are given to it by the State. In this respect it is a part of the State only in that remote sense in which any city, town or other municipal corporation may be said to be a part of the State.
 
 
 12
 Id., see also Mercer County v. Cowles, 74 U.S. (7 Wall) 118, 122, 19 L.Ed. 86 (1868). Given such unambiguous pronouncements by the Supreme Court, repeated over so long a period of time, it is scarcely surprising that other courts have considered as settled the Eleventh Amendment's lack of applicability to counties.[2] See, e.g., Tuveson v. Florida Governor's Council on Indian Affairs, Inc., 734 F.2d 730, 732 (11th Cir.1984) ("Eleventh Amendment immunity does not extend to independent political entities, such as counties"); Hall v. Medical College of Ohio, 742 F.2d 299, 301 (6th Cir.1984) ("Municipalities, counties and other political subdivisions (e.g., public school districts) do not partake of the state's Eleventh Amendment immunity"); Fouche v. Jekyll Island-State Park Authority, 713 F.2d 1518, 1520 (11th Cir.1983) ("Eleventh Amendment immunity to suit in federal court applies to states and state officials but not to municipal corporations, counties, or other political subdivisions of the state."); Morris v. Washington Metropolitan Area Transit Authority, 583 F.Supp. 1522, 1524 (D.D.C.1984) (political subdivisions such as municipalities and counties not entitled to invoke Eleventh Amendment immunity); Kenny v. Board of Trustees, 563 F.Supp. 95, 98 (D.Montana 1983) ("immunity provided the states by the Eleventh Amendment does not extend to counties"); Calkins v. Blum, 511 F.Supp. 1073, 1099 (N.D.N.Y.1981), aff'd, 675 F.2d 44 (2d Cir.1982) (Eleventh Amendment no bar to suit for damages against county commissioners); Woods v. Homes and Structures of Pittsburg, Kansas, Inc., 489 F.Supp. 1270, 1295-96 (D.Kansas 1980) ("bar of the Eleventh Amendment does not extend to counties"); Highfield Water Co. v. Public Service Commission, 488 F.Supp. 1176, 1194 (D.Md.1980) (same); Patterson v. Ramsey, 413 F.Supp. 523, 529 (D.Md.1976), aff'd, 552 F.2d 117 (4th Cir.1977) (same).
 
 
 13
 There is a similar abundance of authority holding the Eleventh Amendment inapplicable to counties of particular states. See, e.g., Heiar v. Crawford County, 746 F.2d 1190, 1194 (7th Cir.1984) (Wisconsin county); Scott v. Greenville County, 716 F.2d 1409, 1422 (4th Cir.1983) (South Carolina county); Holley v. Lavine, 605 F.2d 638, 642-45 (2d Cir.1979), cert. denied, 446 U.S. 913, 100 S.Ct. 1843, 64 L.Ed.2d 266 (1980) (New York county); Lenoir v. Porters Creek Watershed District, 586 F.2d 1081, 1088-89 (6th Cir.1978) (Tennessee and Mississippi counties); Mackey v. Stanton, 586 F.2d 1126, 1130-31 (7th Cir.1978), cert. denied, 444 U.S. 882, 100 S.Ct. 172, 62 L.Ed.2d 112 (1979) (Indiana county); Brown v. Marshall County, 394 F.2d 498, 500 (6th Cir.1968) (Kentucky county); Federal Land Bank v. County Commissioners, 582 F.Supp. 1507, 1512 (D.Colorado 1984) (Colorado county); Allsup v. Knox, 508 F.Supp. 57, 61 (E.D.Ky.1980) (Kentucky county); Jones v. Houser, 489 F.Supp. 795, 798 (E.D.Missouri 1980) (Missouri county); Obenshain v. Halliday, 504 F.Supp. 946, 952 (E.D.Va.1980) (Virginia county); Knight v. Carlson, 478 F.Supp. 55, 56-57 (E.D.Cal.1979) (California counties); Raffety v. Prince George's County, 423 F.Supp. 1045, 1058 n. 9 (D.Md.1976) (Maryland county).
 
 
 14
 Acceptance of the general rule excluding counties from Eleventh Amendment immunity is implicit in a number of other decisions. See, e.g., Campbell v. Pierce County, 741 F.2d 1342 (11th Cir.1984); Travelers Indemnity Co. v. School Board of Dade County, 666 F.2d 505, 509 (11th Cir.), cert. denied, 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 74 (1982); Logan v. Shealy, 660 F.2d 1007, 1015 (4th Cir.1981), cert. denied, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); Ledford v. Delancey, 612 F.2d 883, 887 (4th Cir.1980). We have recognized this general rule in a recent case. Called upon to determine whether the Eleventh Amendment barred a suit against the Mental Health and Mental Retardation Authority of Harris County, Texas, we held that it did not, because "the record before us indicates MHMRA is more like a county or city than an arm of the state." Wheeler v. Mental Health and Mental Retardation Authority, 752 F.2d 1063, 1072-73 (5th Cir.1985).[3] District courts in our Circuit have applied the general rule to Texas counties. See, e.g., Johnston v. Shaw, 556 F.Supp. 406, 409 (N.D.Tex.1982) (citing, among other cases, Mt. Healthy, Lincoln, and Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964)); Wells v. Hutchinson, 499 F.Supp. 174, 204 n. 40 (E.D.Tex.1980); Adams v. Harris County, 316 F.Supp. 938, 944 (S.D.Tex.1970), rev'd on other grounds, 452 F.2d 994 (5th Cir.1971), cert. denied, 406 U.S. 968, 92 S.Ct. 2414, 32 L.Ed.2d 667 (1972) (citing, among other authorities, Lincoln and Wright, supra n. 2).
 
 
 15
 We think the authorities cited above establish without question that Eleventh Amendment immunity does not, as a general rule, extend to counties. We are further persuaded that no exception should be made to this rule without convincing evidence distinguishing the county in question from counties generally. Dallas County has produced no such evidence.[4]
 
 
 16
 The Supreme Court has recognized an exception to the general rule denying Eleventh Amendment immunity to counties for those cases in which the relief granted would run directly against the state. Pennhurst, 465 U.S. at ---- n. 34, 104 S.Ct. at 920 n. 34, 79 L.Ed.2d at 93 n. 34; compare Lake Country Estates, 440 U.S. at 401, 99 S.Ct. at 1177 (exception applies to state agencies, not to counties); see also Wheeler, 752 F.2d at 1073 (agency would be immune "if payment of the judgment were to be made directly from the state treasury") (emphasis added). We therefore agree with Dallas County that the most crucial factor to be considered in determining the County's status is "whether the funds to defray any award would be derived from the state treasury." Laje, 665 F.2d at 727. The County argues that it falls within this exception to the rule because Texas law "declares all property in the hands of counties to belong to the State itself, subject to the absolute control and disposition of the Texas Legislature." In support of this proposition, the County cites Robbins v. Limestone County, 114 Tex. 345, 268 S.W. 915 (1925), and Baker v. Dunning, 77 Tex. 28, 13 S.W. 617, 618 (1890) ("counties ... hold their property, as they hold their existence, at the will of the state ... and ... it is subject to be resumed by the state at its pleasure"). We are not persuaded.
 
 
 17
 First, the County has not shown that a different relationship obtains between other states and their counties. Second, the County's proposition is unsupported by either Texas statutes or the Texas Constitution; the cases cited support the proposition only insofar as the county holds the property at issue as an agent of the state. It is clear, from Dallas County's own authorities, that not all county property is so held. The Texas Supreme Court stated in Baker that "[i]n Milam Co. v. Bateman, 54 Tex. 153, it was held that the state could not take from the counties the lands which had been donated to them for educational purposes. We are of the opinion that that decision should be adhered to." 13 S.W. at 618. There is language in Robbins to similar effect: "If the title and ownership of the public roads reposes in the counties under the Constitution, and if they are property of the counties, then they would have the right to control them, and certainly the state, or any other power, would have no right to take them in any manner, except and unless compensation should be made therefor." 268 S.W. at 918. Nothing in either of these cases, or in any of the other authorities cited by the County, suggests that the State may seize at will funds raised by the County through properly authorized taxation, bond issues, or sale of property.
 
 
 18
 Third, the position taken by Dallas County here is patently inconsistent with its position in Barrett v. Thomas, 649 F.2d 1193 (5th Cir.1981), cert. denied, 456 U.S. 925, 102 S.Ct. 1969, 72 L.Ed.2d 440 (1982). The County moved to intervene in Barrett[5] on the ground that "an adjudication of Thomas' liability in its absence would impair its interest in protecting the County treasury against the plaintiffs' claims." 649 F.2d at 1197. The County now suggests that its treasury belongs to the state, and effectively disavows any interest in it. We find this abrupt volte-face unconvincing; it is unlikely in the extreme that the County made the significant expenditures of time and money required by its multiple appeals in Barrett in order to protect the state's property.[6] Dallas County's contention is further refuted by our conclusion in Barrett that "[t]he district court has ample authority to bind Dallas County by its order to require payment from County funds." 649 F.2d at 1206 (emphasis added). Our belief in the character of such funds is unshaken by the arguments made here by the County. We therefore find that an award against Dallas County is not an impermissible award against the state, and that the funds to defray such an award would not be derived from the state treasury.[7] 7] Dallas County's attempt to bring itself within the "state treasury" exception to the general rule against extending Eleventh Amendment protection to counties must therefore fail.
 
 
 19
 Dallas County also asserts entitlement to Eleventh Amendment immunity on another ground. The County claims that Texas counties are unique and ought therefore to be excepted from the general rule denying Eleventh Amendment immunity to counties. In support of this assertion, the County offers a number of quotations from Texas state cases of decidedly antique vintage,[8] of which this language from Bexar County v. Linden, 110 Tex. 339, 220 S.W. 761 (1920), is typical:
 
 
 20
 [Counties] are essentially instrumentalities of the State. They are the means whereby the powers of the State are exerted through a form and agency of local government for the performance of those obligations which the State owes the people at large. They are created by the sovereign will without any special regard to the will of those who reside within their limits. Their chief purpose is to make effective the civil administration of the State government. The policy which they execute is the general policy of the State. Through them the powers of government operate upon the people and are controlled by the people. They are made use of by the State for the collection of taxes, for the diffusion of education, for the construction and maintenance of public highways, and for the care of the poor. All of these things are matters of state, as distinguished from municipal, concern. They intimately affect all the people. The counties are availed of as efficient and convenient means for the discharge of the State's duty in their regard to all the people.
 
 
 21
 220 S.W. at 762.
 
 
 22
 As evidence of the uniqueness of Texas counties, Bexar is singularly unconvincing. There is nothing in the passage quoted above, or in any of the authorities cited by Dallas County, to distinguish Texas counties from counties generally, which were described by the Supreme Court in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), as follows:
 
 
 23
 Political subdivisions of States--counties, cities, or whatever--never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions. As stated by the Court in Hunter v. City of Pittsburgh, 207 U.S. 161, 178, 52 L.Ed. 151, 159, 28 S.Ct. 40 , these governmental units are "created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them," and the "number, nature and duration of the powers conferred upon [them] ... and the territory over which they shall be exercised rests in the absolute discretion of the State." The relationship of the States to the Federal Government could hardly be less analogous.
 
 
 24
 377 U.S. at 575, 84 S.Ct. at 1388. Moreover, in vacating the judgment of the Texas Supreme Court in Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), the Supreme Court implicitly rejected the claim of uniqueness made here by Dallas County:The Texas commissioners courts are assigned some tasks which would normally be thought of as "legislative," others typically assigned to "executive" or "administrative" departments, and still others which are "judicial." In this regard Midland County's Commissioners Court is representative of most of the general governing bodies of American cities, counties, towns, and villages. One knowledgeable commentator has written of "the states' varied, pragmatic approach in establishing governments." R. Wood, in Politics and Government in the United States 891-892 (A. Westin ed. 1965). That approach has produced a staggering number of governmental units--the preliminary calculation by the Bureau of the Census for 1967 is that there are 81,304 "units of government" in the United States--and an even more staggering diversity. Nonetheless, while special-purpose organizations abound and in many States the allocation of functions among units results in instances of overlap and vacuum, virtually every American lives within what he and his neighbors regard as a unit of local government with general responsibility and power for local affairs. In many cases citizens reside within and are subject to two such governments, a city and a county. The Midland County Commissioners Court is such a unit.
 
 
 25
 390 U.S. at 482-83, 88 S.Ct. at 1119-20 (emphasis added) (footnotes omitted). Further, the attributes of Texas counties, as enumerated in Avery, 390 U.S. at 483-84, 88 S.Ct. at 1119-20, and as provided by Texas law, are virtually indistinguishable from those of California counties, as described in Moor :
 
 
 26
 Most notably, under California law a county is given "corporate powers" and is designated a "body corporate and politic." In this capacity, a county may sue and be sued, and, significantly for purposes of suit, it is deemed to be a "local public entity" in contrast to the State and state agencies. In addition, the county, and from all that appears the county alone, is liable for all judgments against it and is authorized to levy taxes to pay such judgments. A California county may also sell, hold, or otherwise deal in property, and it may contract for the construction and repairs of structures. The counties also are authorized to provide a variety of public services such as water service, flood control, rubbish disposal, and harbor and airport facilities. Financially, the counties are empowered to issue general obligation bonds payable from county taxes.
 
 
 27
 411 U.S. at 719-20, 93 S.Ct. at 1800-01 (footnotes omitted). It does not appear that Texas counties lack even one of these attributes.[9] Thus, because Texas counties are not unique, but instead share all the characteristics of California counties and, under Reynolds, of counties generally, we conclude, as did the Supreme Court in Moor, that Texas counties are not mere arms or agents of the state; they are independent units of local government to which the immunity granted by the Eleventh Amendment does not apply. We therefore reject the claim of Dallas County to such immunity and hold it subject to suit in federal court.[10]
 
 
 28
 This holding necessarily disposes of Dallas County's contention that it is not a "person" within the meaning of 42 U.S.C. Sec. 1983; under Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a unit of local government not protected by the Eleventh Amendment is such a person. 436 U.S. at 690 and n. 54, 98 S.Ct. at 2035 and n. 54.[11]
 
 The Dallas County System
 
 29
 Dallas County and its judges also assign as error the trial court's holding, in its Memorandum Order of November 30, 1981, that Texas law requires issuance of a valid capias to be preceded by a neutral magistrate's determination of probable cause. Because Texas courts have the final authority to interpret Texas legislation, Brown v. Ohio, 432 U.S. 161, 167, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187 (1977); Birmingham Fire Insurance Co. v. Winegardner and Hammons, Inc., 714 F.2d 548, 550 (5th Cir.1983), we must look to the decisions of Texas courts in our review of this holding; "the latest and most authoritative expression of state law applicable to the facts of the case is controlling." Brumley Estate v. Iowa Beef Processors, Inc., 715 F.2d 996, 997 (5th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1288, 79 L.Ed.2d 690 (1984). There is little difficulty in applying these principles here, for in Sharp v. State, 677 S.W.2d 513 (Tex.Crim.App.1984), the Texas Court of Criminal Appeals, sitting en banc, explicitly approved the trial court's interpretation of the Texas statutory scheme for issuing capias. In its opinion, the Texas court quoted extensively from the Crane court's November Order:
 
 
 30
 In Crane, Judge Higginbotham addressed the requirement for a probable cause determination prior to the issuance of a misdemeanor capias under Texas law, read in its proper matrix of common law and constitutional standards. Although recognizing that the Texas statutory scheme authorizing capias does not by its express terms require a probable cause determination:
 
 
 31
 "Article 23.04 of the Texas Criminal Code provides that '[i]n misdemeanor cases the capias or summons shall issue from a court having jurisdiction of the case.' At the same time, Article 23.03 provides that 'A capias shall be immediately issued by the district clerk upon each indictment for felony presented....' (emphasis supplied). As will be seen, this difference between 23.03 and 23.04 makes sense when read against the common law rules, and the Texas rules, of arrests for misdemeanors and felonies and explains Article 23.01 which defines capias ... 'as a writ issued by the court or clerk, and directed to any peace officer of the State of Texas, commanding him to arrest a person accused of an offense and bring him before that court immediately....' The explanation is that the scheme presupposes an awareness that valid capias can issue only upon properly determined probable cause. In the case of a felony that determination is made by the grand jury in its decision to indict and it may be issued by the court clerk. With a misdemeanor capias issues not from a County Clerk but from a court with jurisdiction over the case. I conclude then that Texas law requires that to be valid a misdemeanor capias must be issued from a court with jurisdiction over the case after a determination by a neutral magistrate of probable cause." Id. at page 5.
 
 
 32
 Judge Higginbotham's conclusion is inescapably correct, and we adopt it as our own. To do otherwise would render the statutory scheme unconstitutional.
 
 
 33
 677 S.W.2d at 517-18 (emphasis in original). This language is clearly dispositive of the County's contention; the trial court did not err in its reading of Texas law.
 
 
 34
 The County and its judges next argue that the capias procedures used in Dallas County to arrest people were not unconstitutional. It is not clear that this point is properly before this Court. In accordance with the general rule, established in Siler v. Louisville & Nashville Railroad Co., 213 U.S. 175, 192-93, 29 S.Ct. 451, 455-56, 53 L.Ed. 753 (1909), that "a federal court should decide a case on state-law grounds where possible to avoid a federal constitutional question," Pennhurst, 465 U.S. at ----, n. 28, 104 S.Ct. at 918 n. 28, 79 L.Ed.2d at 90 n. 28, the trial court declined to reach the constitutional issue in this case and grounded its holding exclusively on state law. This was not necessarily error under Pennhurst. That case explicitly affirmed "the desirability of applying the Siler principle in cases where the federal court has jurisdiction to decide the state-law issues." Id. Pennhurst deprives a federal court of such jurisdiction, and displaces the Siler rule, in only those instances where the claim is against state officials to whom the Ex parte Young[12] exception to Eleventh Amendment immunity would otherwise apply, and in which the relief granted would run against the state:
 
 
 35
 [A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when--as here--the relief sought and ordered has an impact directly on the State itself.
 
 
 36
 Pennhurst, 465 U.S. at ----, 104 S.Ct. at 917, 79 L.Ed.2d at 89. Crane's action is not governed by Pennhurst because, as discussed below, it was brought against County officials, and because the relief sought ran only against the County.
 
 
 37
 The manner in which the Supreme Court dealt with the defendant county officials in Pennhurst supports this conclusion. Relief was denied against these defendants not because they were protected by the Eleventh Amendment,[13] but rather because "any relief granted against the county officials on the basis of the state statute would be partial and incomplete at best." --- U.S. at ----, 104 S.Ct. at 921, 79 L.Ed.2d at 94. The relief sought in Crane presented no such problems. We therefore hold that Pennhurst did not divest the trial court of jurisdiction to determine whether the challenged Dallas County procedures violated Texas law, and affirm the trial court's conclusion that they did so.
 
 
 38
 This holding does not, however, allow us to ignore the constitutional question presented. Although the matter is far from clear, it appears that the damages awarded Crane by the jury were Sec. 1983 damages, rather than damages stemming from Crane's pendant state law claims. We infer this from the trial court's statement that "[o]n March 11, 1982, the Court held that Dallas County was not liable for Sec. 1983 damages because the accused practices were implemented by officers wearing their state badges and thus did not constitute official County policy under Monell v. Department of Social Services, 436 U.S. 568 [98 S.Ct. 2018, 56 L.Ed.2d 611] (1978)." Memorandum Order of July 26, 1983 at 2. Inasmuch as Monell has no conceivable application to state law causes of action, and thus could not constitute a bar to recovery of damages arising under state law, it must follow that the injury for which the jury awarded Crane damages was one cognizable under Sec. 1983. It is axiomatic that Sec. 1983 damages can derive only from deprivations of rights secured by the Constitution or laws of the United States. A finding that the Dallas County procedures deprived Crane of such rights was therefore a prerequisite to an award to him of damages under Sec. 1983.
 
 
 39
 Although the trial court made no such finding explicitly, the required finding may be implicit in the trial court's Order of November 30, 1981:
 
 
 40
 The Fourth Amendment provides that "no warrant shall issue except on probable cause." As part of this guarantee a warrant for arrest is to be issued only after a detached and neutral magistrate, Coolidge v. New Hampshire, 403 U.S. 443, 444-53 [91 S.Ct. 2022, 2026-31, 29 L.Ed.2d 564] (1971), determines that there is probable cause to issue it. Aquilar v. Texas, 378 U.S. 108 [84 S.Ct. 1509, 12 L.Ed.2d 723] (1964); Giordenello v. U.S., 357 U.S. 480 [78 S.Ct. 1245, 2 L.Ed.2d 1503] (1958).
 
 
 41
 The procedure which Dallas County has followed in issuing misdemeanor capias would not meet this requirement if the state statutes were read as permitting a capias to issue without determining probable cause. Specifically, this requirement of probable cause is not met when, as is the case in Dallas County, an assistant clerk in the Criminal Processing Section of the County Clerk's office transfers (types) the information from an affidavit provided by the District Attorney to a document (capias) authorizing an arrest and signs that document in her name or the name of another clerk.
 
 
 42
 Memorandum Order of November 30, 1981 at 6 (footnote omitted).
 
 
 43
 That the trial court found the Dallas County practices to deprive Crane of federally guaranteed rights seems also to be implicit in the special interrogatories submitted to the jury. Two of these interrogatories asked the jury to determine whether the County Clerk and the County Criminal District Attorney, in their respective official capacities, "knew, or should have known, that the procedure followed in the issuing of capias infringed a clearly established constitutional right of Stephen Crane."
 
 
 44
 These questions, and the award of Sec. 1983 damages to Crane, plainly presuppose a finding by the trial court that the challenged practices were in fact unconstitutional. Despite the absence of an explicit finding to that effect, we are persuaded that one may be inferred from the trial court's Memorandum Order of November 30, 1981; given the trial court's admirable analysis of the constitutional issue in that Order, no remand is necessary. See Gulf Towing Company, Inc. v. Steam Tanker, Amoco New York, 648 F.2d 242, 245 (5th Cir.1981) (remand not required if complete understanding of issues is possible and there is sufficient basis for appellate court's consideration of merits). We will therefore consider the County's contention that the Dallas County procedures passed constitutional muster.
 
 
 45
 This contention is grounded on Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). The County construes Gerstein to permit arrests without prior judicial determinations of probable cause, so long as such determinations are made before extended restraints of liberty after arrest. Because the Dallas County procedures provided, at least in theory, for post-arrest judicial determinations of probable cause, the County argues that they satisfied the constitutional requirements established in Gerstein. We disagree. The petitioners in Gerstein were arrested without warrants on felony charges. Gerstein, 420 U.S. at 116-17 and n. 18, 95 S.Ct. at 864-65 and n. 18. Thus, as the trial court correctly noted, "[i]mplicit in the Court's analysis in Gerstein is the premise that review by a neutral magistrate of any probable cause to arrest for a felony committed outside an arresting officer's presence need not precede the arrest. Gerstein thus accepts the validity of a warrantless arrest upon probable cause for a felony and addresses the adequacy of its post-arrest review." Memorandum Order of November 30, 1981, at 12. In so doing, the Gerstein Court was scarcely breaking new ground; it has been established for centuries that felony arrests may be made without warrants upon probable cause. It is equally well established that the rule is otherwise for misdemeanor arrests. The Supreme Court explained the distinction in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925):
 
 
 46
 The usual rule is a police officer may arrest without warrant one believed by the officer, upon reasonable cause, to have been guilty of a felony, and that he may only arrest without a warrant one guilty of a misdemeanor if committed in his presence. Kurtz v. Moffitt, 115 U S 487, 29 L Ed 458, 6 Sup Ct Rep 148; Bad Elk v. United States, 177 U S 529, 44 L Ed 874, 20 Sup Ct Rep 729. The rule is sometimes expressed as follows:
 
 
 47
 "In cases of misdemeanor, a peace officer, like a private person, has at common law no power of arresting without a warrant except when a breach of the peace has been committed in his presence, or there is reasonable ground for supposing that a breach of peace is about to be committed or renewed in his presence." 9 Laws of England (Halsbury), part III. 612.
 
 
 48
 The reason for arrest for misdemeanors without warrant at common law was promptly to suppress breaches of the peace (1 Stephen, History of Criminal Law, 193), while the reason for arrest without warrant on a reliable report of a felony was because the public safety and the due apprehension of criminals charged with heinous offenses required that such arrests should be made at once without warrant. Rohan v. Sawin, 5 Cush. [Mass]. 281.
 
 
 49
 267 U.S. at 156-57, 45 S.Ct. at 286-87. The law has not changed since Carroll; its statement of the "usual rule" was quoted with approval by the Supreme Court in United States v. Watson, 423 U.S. 411, 417, 96 S.Ct. 820, 824, 46 L.Ed.2d 598 (1976). The context in which this quotation appeared is relevant here. It was preceded by the statement that "there is nothing in the Court's prior cases indicating that under the Fourth Amendment a warrant is required to make a valid arrest for a felony." 423 U.S. at 416-17, 96 S.Ct. at 824-25 (emphasis added). It was followed by a review of the Court's decisions involving warrantless felony arrests, including Gerstein. 423 U.S. at 417-18, 96 S.Ct. at 825-26. The Watson Court then enunciated the principle governing these decisions:
 
 
 50
 The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable grounds for making the arrest. 10 Halsbury's Laws of England 344-345 (3d ed 1955); 4 W. Blackstone, Commentaries * 292; 1 J. Stephen, A History of the Criminal Law of England 193 (1883); 2 M. Hale, Plea of the Crown *72-74; Wilgus, Arrest Without a Warrant, 22 Mich L Rev, 547-550, 686-688 (1924); Samuel v. Payne, 1 Dougl 359, 99 Eng Rep 230 (KB 1780); Beckwith v. Philby, 6 Barn & Cress 635, 108 Eng Rep 585 (KB 1827). This has also been the prevailing rule under state constitutions and statutes. "The rule of the common law, that a peace officer or a private citizen may arrest a felon without a warrant, has been generally held by the courts of the several States to be in force in cases of felony punishable by the civil tribunals." Kurtz v. Moffitt, 115 U S 487, 504, 29 L Ed 458, 6 S Ct 148 (1885).
 
 
 51
 423 U.S. at 418-19, 96 S.Ct. at 825-26. After a review of state cases following the same principle, the Court concluded,
 
 
 52
 The balance struck by the common law in generally authorizing felony arrests on probable cause, but without a warrant, has survived substantially intact. It appears in almost all of the States in the form of express statutory authorization. In 1963, the American Law Institute undertook the task of formulating a model statute governing police powers and practice in criminal law enforcement and related aspects of pretrial procedure. In 1975, after years of discussion, A Model Code of Prearraignment Procedure was proposed. Among its provisions was Sec. 120.1 which authorizes an officer to take a person into custody if the officer has reasonable cause to believe that the person to be arrested has committed a felony, or has committed a misdemeanor or petty misdemeanor in his presence. The commentary to this section said: "The Code thus adopts the traditional and almost universal standard for arrest without a warrant."
 
 
 53
 This is the rule Congress has long directed its principal law enforcement officers to follow.
 
 
 54
 423 U.S. at 421-23, 96 S.Ct. at 826-28 (footnotes omitted).
 
 
 55
 Watson thus places Gerstein squarely amongst cases decided on the basis of the general rule permitting warrantless felony arrests upon probable cause. Given the validity of such arrests, it follows inescapably that judicial determinations of probable cause may follow, rather than precede, them. Nothing compels a similar conclusion as to misdemeanor arrests. The general rule requires that they be made upon warrants, unless the officer has witnessed the offense; the warrant requirement is meaningless absent a judicial determination of probable cause. The Supreme Court has recognized this truth on many occasions. In McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), the Court stated,
 
 
 56
 We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home.
 
 
 57
 335 U.S. at 455-56, 69 S.Ct. at 193-94 (emphasis added). Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), is to similar effect:
 
 
 58
 "Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes," United States v. Jeffers, 342 U S 48, 51, 96 L Ed 59, 64, 72 S Ct 93 , and that searches conducted outside the judicial process, without prior approval by judge or magistrate are per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions.
 
 
 59
 389 U.S. at 357, 88 S.Ct. at 514 (footnote omitted). The same point is clearly stated in Shadwick v. City of Tampa, 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972):
 
 
 60
 The warrant traditionally has represented an independent assurance that a search and arrest will not proceed without probable cause to believe that a crime has been committed and that the person or place named in the warrant is involved in the crime.
 
 
 61
 407 U.S. at 350, 92 S.Ct. at 2122. United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), is particularly relevant here, for in that case the Court rejected the government's argument that after-the-fact judicial review could be substituted for prior judicial determination of probable cause. Because of its relevance, the Court's discussion merits quotation at some length:
 
 
 62
 The warrant clause of the Fourth Amendment is not dead language. Rather, it has been "a valued part of our constitutional law for decades, and it has determined the result in scores and scores of cases in courts all over this country. It is not an inconvenience to be somehow 'weighed' against the claims of police efficiency. It is, or should be, an important working part of our machinery of government, operating as a matter of course to check the 'well-intentioned but mistakenly overzealous executive officers' who are a part of any system of law enforcement." Coolidge v. New Hampshire, 403 U S at 481 [91 S.Ct. at 2046], 29 L Ed 2d at 592.
 
 
 63
 Over two centuries ago, Lord Mansfield held that common-law principles prohibited warrants that ordered the arrest of unnamed individuals whom the officer might conclude were guilty of seditious libel. "It is not fit," said Mansfield, "that the receiving or judging of the information should be left to the discretion of the officer. The magistrate ought to judge; and should give certain directions to the officer." Leach v. Three of the King's Messengers, 19 How St Tr 1001, 1027 (1765).
 
 
 64
 Lord Mansfield's formulation touches the very heart of the Fourth Amendment directive.... Inherent in the concept of a warrant is its issuance by a "neutral and detached magistrate." Coolidge v. New Hampshire, supra, at 453 [91 S.Ct. at 2031], 29 L Ed 2d at 575. The further requirement of "probable cause" instructs the magistrate that baseless searches shall not proceed.
 
 
 65
 * * *
 
 
 66
 * * *
 
 
 67
 The Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised. This judicial role accords with our basic constitutional doctrine that individual freedoms will best be preserved through a separation of powers and division of functions among the different branches and levels of Government. John M. Harlan, Thoughts at a Dedication: Keeping the Judicial Function in Balance, 49 ABAJ 943-944 (1963). The independent check upon executive discretion is not satisfied, as the Government argues, by "extremely limited" post-surveillance judicial review.
 
 
 68
 407 U.S. at 316-18, 92 S.Ct. at 2136-37 (footnotes and citations omitted). See also Chimel v. California, 395 U.S. 752, 761, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969) (quoting McDonald ).
 
 
 69
 These passages are clear and unequivocal: the Fourth Amendment requires that no warrant issue but upon probable cause, as determined by a neutral and detached magistrate. It is undisputed that the Dallas County procedures challenged here did not meet this requirement. The trial court therefore held them unconstitutional; we affirm its holding.[14]Liability for Money Damages
 
 
 70
 The jury awarded Crane money damages and assessed them against the County and the District Attorney. The trial court held the County immune from liability for damages because "the accused practices were implemented by state officers, not county officers. The acts were neither done for the county nor subject to its control. The accused practices can then hardly be said to be a county custom or practice." Crane v. Texas, 534 F.Supp. 1237, 1246 (N.D.Tex.1982). The trial court held the District Attorney immune from liability for money damages because there was no evidence that he breached a duty to the County.[15] Id. Crane contends that the trial court erred in holding all defendants immune from liability for money damages. We agree, although for reasons different from those offered by Crane.
 
 
 71
 The trial court's rationale for County immunity appears premised on a finding that the District Attorney was an officer of the state. This finding presents problems. State officials partake of the Eleventh Amendment immunity of the states they serve. Edelman, 415 U.S. at 663, 94 S.Ct. at 1355; Familias Unidas, 619 F.2d at 404-05. "[T]he Supreme Court has flatly stated that neither the statutory language nor legislative history of section 1983 evinces a sufficient, express congressional intention to override the traditional immunities of the states to allow private damage actions against the states and their officials pursuant to that statute." Familias Unidas, 619 F.2d at 405 (emphasis added), citing Quern v. Jordan, 440 U.S. 332, 339, 99 S.Ct. 1139, 1144, 59 L.Ed.2d 358 (1979). The Eleventh Amendment thus bars a private suit for damages brought under Sec. 1983 against a state official; the exception to Eleventh Amendment immunity provided by Ex parte Young does not extend to such actions. Pennhurst, 465 U.S. at ----, 104 S.Ct. at 908-909, 79 L.Ed.2d at 79-80. Further, the Supreme Court held in Pennhurst that the Ex parte Young exception does not extend to violations of state law; thus, "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the state that is protected by the Eleventh Amendment," and "this principle applies as well to state law claims brought into federal court under pendent jurisdiction." 465 U.S. at ----, 104 S.Ct. at 919, 79 L.Ed.2d at 92.[16]
 
 
 72
 The import of these principles is clear. As a state official, the District Attorney was immune from more than liability for damages; the jurisdictional bar of the Eleventh Amendment rendered him immune from an action for damages. The trial court was thus required to dismiss Crane's action for damages against the District Attorney if it found him to be a state official.[17] By permitting the action to proceed, however, the trial court implicitly found the District Attorney to be something other than a state officer, to wit, an official of a local unit of government itself unprotected by the Eleventh Amendment. This conclusion is buttressed by the trial court's reason for holding the District Attorney immune from liability for damages. If the District Attorney were a state officer, the Eleventh Amendment alone would render him immune from such liability; in this circumstance, whether he breached a duty owed to the County would be perfectly irrelevant.
 
 
 73
 It is apparent from the foregoing that the trial court's reasoning in this regard cannot be made internally consistent. We therefore turn to the second premise on which the trial court grounded the County's immunity from damages: that the accused practices "were neither done for the county nor subject to its control." 534 F.Supp. at 1246. In Monell, the Supreme Court held that local governments "can be sued directly under Sec. 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690, 98 S.Ct. at 2573. This Court, en banc, has construed Monell to permit the imposition of municipal liability when the alleged deprivation of federally guaranteed rights is inflicted pursuant to official policy, official policy being defined as
 
 
 74
 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
 
 
 75
 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under Sec. 1983 unless they execute official policy as above defined.
 
 
 76
 Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir.1984) (en banc), quoting Bennett v. City of Slidell, 735 F.2d 861, 862 (5th Cir.1984) (en banc). Although the trial court did not have the benefit of this formulation, it did consider whether the challenged practices constituted County policy under Monell, and concluded that they did not because the practices were not subject to County control. 534 F.Supp. at 1237. The trial court's conclusion is flatly contradicted by the course of events of this litigation and cannot be reconciled therewith.
 
 
 77
 In its Memorandum Order of November 30, 1981, the trial court asked the defendants for "concrete proposals" for a new Dallas County system of issuing capias. Id. at 13. The judges and the District Attorney submitted such proposals; they were filed with the court on December 9 and 11, 1981, respectively. The District Attorney had begun to make changes in the system even before this, however. A letter from the District Attorney to the Chief of Police of the City of Dallas, dated July 20, 1981, announces "I plan certain changes in the procedure for the filing of criminal cases with the Dallas County District Attorney's Office." A memorandum from the District Attorney to "All Police Departments and Agencies Filing Cases with the Dallas County District Attorney's Office," dated September 17, 1981, states "Certain changes in the procedure for the filing of criminal cases with the Dallas County District Attorney's Office are presently (sic) being implemented." A letter from the District Attorney to Judge Ellis of the Dallas County Criminal Court, dated December 7, 1981, begins, "As a result of the recent decision by Judge Higginbotham in Cause No. CA 3-80-0978-6, styled Stephen C. Crane versus State of Texas, et al, the following is the form of action this office would like to take--with your cooperation." In none of these communications is there the slightest indication that the District Attorney acted other than independently; there is no hint of any perceived necessity by the District Attorney to consult with or invite the participation of any state official, for example, a member of the State Attorney General's Office. To the contrary, the record plainly shows that the District Attorney was alone responsible for the County system and could change it at will. This fact is implicit in the trial court's order of February 4, 1982, denying injunctive relief because
 
 
 78
 [B]eginning as early as June 1981, some five months before this court's Memorandum Order of November 30, 1981, defendants voluntarily changed the method used to issue capias in misdemeanor cases. Implementation of this change has proceeded at a steady pace. At all times, defendants have demonstrated by concrete action their good faith effort to achieve a sound and legally sufficient system.
 
 
 79
 Id.[18] In Familias Unidas, this Court described the circumstances in which the acts of a county judge would constitute official county policy under Monell:
 
 
 80
 [A]t least in those areas in which he, alone, is the final authority or ultimate repository of county power, his official conduct and decisions must necessarily be considered those of one "whose edicts or acts may fairly be said to represent official policy" for which the county may be held responsible under section 1983.
 
 
 81
 619 F.2d at 404. This language, which "relates to the officer who obtains policymaking authority by virtue of the office to which that officer is elected," was explicitly affirmed in Bennett, 735 F.2d at 862. It clearly covers the acts of the District Attorney here. His authority to establish County procedures for issuing misdemeanor capias derived from the County office to which he was elected by County voters. That he had such authority is patent and admitted by the District Attorney himself; his first amended answer, filed with the court on September 12, 1980, states that he "has established policies and procedures of an administrative nature only as to the filing and processing of criminal information in Dallas County." Id. at 4. Thus, because the ultimate authority for determining County capias procedures reposed in the District Attorney, an elected County official, his decisions in that regard must be considered official policy attributable to the County. As we stated in Bowen v. Watkins, 669 F.2d 979 (5th Cir.1982),
 
 
 82
 At some level of authority, there must be an official whose acts reflect governmental policy, for the government necessarily acts through its agents. Thus the question becomes one of identifying the official who has authority to make policy; then municipal liability attaches to acts performed pursuant to that policy. When an official has final authority in a matter involving the selection of goals or of means of achieving goals, his choices represent governmental policy.
 
 
 83
 669 F.2d at 989. The County in this case acted through the District Attorney; he selected the means by which the County was to achieve a sound and legally sufficient capias system. His choice of an unsound and legally insufficient system represents County policy for which the County is liable. The trial court's finding to the contrary was error, and we reverse it.[19]
 
 
 84
 Although the jury found that the District Attorney knew, or should have known, that the Dallas County capias system infringed Crane's clearly established constitutional rights, the trial court held him immune from liability for damages. It found that the District Attorney had no duty to advise the County on its capias system; there being no duty, there could be no breach, and therefore no liability. This finding was grounded on Tex.Rev.Civ.Stat.Ann. art. 334 (Vernon 1982), which provides, "The district and county attorneys, upon request, shall give an opinion or advice in writing to any county or precinct officer of their district or county, touching their official duties." There was no evidence that any County official had requested the District Attorney's advice on the County's capias system. The statute plainly did not require the District Attorney to give the County unsolicited legal advice. Therefore, the trial court reasoned, the District Attorney could not be liable for not doing something he had no duty to do.
 
 
 85
 The obvious flaw in this reasoning is that the statute quoted above has no application to actions taken by the District Attorney in the exercise of his discretionary authority. Where, as here, the District Attorney himself established the procedures to be followed by the County in issuing misdemeanor capias, the statute does not and could not apply unless it were construed to require a County official to ask the District Attorney to provide legal advice to himself about his own system. The suggestion is not plausible. It is true, as the trial court noted, that the District Attorney has no duty, statutory or otherwise, to monitor independently the manner in which other officials performed their public duties. This fact does not, however, relieve him of the duty to monitor his own actions, nor does it relieve him of responsibility when those actions result in the deprivation of federally guaranteed rights. The District Attorney established the procedures used in Dallas County to issue misdemeanor capias. His duty to do so in accordance with the United States Constitution and the laws of Texas was one entirely independent of any duty to render legal advice to others. Thus, the trial court erred in finding the District Attorney immune from liability by reason of Tex.Rev.Civ.Stat.Ann. art. 334. Neither that statute nor any other provides him with immunity from liability for actions that infringe the constitutional rights of others. We therefore hold the District Attorney liable for the damages awarded by the jury and assessed against him.
 
 
 86
 We do not, however, hold him liable in his individual capacity. The conduct complained of was that of a County officer engaged in the furtherance of his duties; we have found that conduct to constitute official policy attributable to the County. This finding, as well as those factors discussed supra n. 15, compel the conclusion that Crane brought suit against the District Attorney in his official capacity. See Williams, 692 F.2d at 1040. Because the defense of qualified, good faith immunity is not available to a defendant sued in his official capacity, Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); Barrett, 649 F.2d at 1203 (Brown, J., concurring); Familias Unidas, 619 F.2d at 403 n. 12, it is thus unnecessary for us to determine whether, as Crane contends, the District Attorney was unprotected by such immunity.[20]
 
 
 87
 For the foregoing reasons, we hold that the trial court erred in finding the District Attorney and the County immune from liability for money damages. The jury's award of money damages to Crane is accordingly reinstated. Because the injury for which damages were awarded resulted from the official policy of the County as embodied in the official actions of the District Attorney, the County will be liable for those damages assessed against the District Attorney as well as those assessed against itself.
 
 Liability for Attorneys' Fees
 
 88
 The trial court awarded Crane attorneys' fees pursuant to the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. Sec. 1988. It assessed the fees against the State of Texas because "[t]he actors whose conduct was at issue in the maintenance of the warrant system and its specific application to Crane were wearing their state hats." Memorandum Order of September 8, 1982, at 3. The State of Texas contends that this was error, arguing that the fee award should have been assessed against Dallas County. We agree.
 
 
 89
 The general rule regarding Sec. 1988 attorneys' fees is set forth in Familias Unidas:An award of attorneys' fees under section 1988 against an individual in his official capacity ordinarily is treated as an award against the particular governmental body of which he is a representative, and is to be paid from the funds of that body, whether or not it is a named party to the suit.
 
 
 90
 619 F.2d at 406, citing Hutto v. Finney, 437 U.S. 678, 693-700, 98 S.Ct. 2565, 2574-2579, 57 L.Ed.2d 522 (1978). Thus, attorneys' fees are properly assessed against the state when its officials are sued in their official capacities, Hutto, 437 U.S. at 693-94, 98 S.Ct. at 2574-75, and when their conduct may fairly be said to represent its official policy. See Barrett, 649 F.2d at 1201; Familias Unidas, 619 F.2d at 406. Neither condition is met here.
 
 
 91
 Crane did not sue the individual defendants for actions taken on behalf of the State; rather, he sued them because of the roles they played in establishing and implementing the Dallas County system of issuing misdemeanor capias. Defendants created that system and controlled it for the County, not for the State; therefore, in so doing they acted as County, not State, officials. The system they created and controlled violated Texas law; thus, it can scarcely be said to represent the official policy of the State of Texas.[21] We have held instead that it represented the official policy of Dallas County. The award of Crane's attorneys' fees must therefore run against the County; see Williams, 692 F.2d at 1040; Barrett, 649 F.2d at 1201-02. Accordingly, we reverse[22] the trial court's assessment of those fees against the State, and render judgment holding Dallas County liable for them.
 
 Conclusion
 
 92
 In sum, we hold that neither Dallas County nor its officials are protected by the immunity provided by the Eleventh Amendment and that both the County and its officials are "persons" within the meaning of 42 U.S.C. Sec. 1983. We affirm the trial court's findings that the Dallas County system of issuing misdemeanor capias violated both Texas law and the United States Constitution. We reverse the findings of immunity from liability for money damages as to the County and the District Attorney, and hold the former liable for its official policy and the latter liable in his official capacity. We therefore reinstate the jury's award of money damages. We reverse the assessment of attorneys' fees against the State of Texas, and render judgment against the County for the fees. It is so
 
 
 93
 ORDERED.
 
 
 
 1 U.S. Const. amend. XI provides as follows: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."
 The Eleventh Amendment has been held since 1890 to bar as well federal suits by citizens against their own states. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).
 
 
 [2]
 Commentators consider it settled as well. Professor Wright, for example, flatly states that "[t]he Eleventh Amendment does not provide immunity for counties and similar municipal counties." Wright, Federal Courts Sec. 46, at 274 (1983); see also 1 J. Moore, J. Lucas, H. Fink, D. Weckstein & J. Wicker, Moore's Federal Practice p 0.60 [2.____ 2] (2d ed. 1984)
 
 
 [3]
 Familias Unidas v. Briscoe, 619 F.2d 391 (5th Cir.1980), is consistent with the general rule we state here. In that case, we held the Hondo Independent School District liable and Medina County not liable for damages under Sec. 1983 because the policy at issue could be attributed to the former, but not to the latter. We then continued,
 Though logic would seem, then, to impel a finding of liability against the State--since the statute obviously represents the official policy of the State--the State enjoys immunities not shared by its two political subdivisions. In addition to a state's traditional sovereign immunity, the Eleventh Amendment and its judicial gloss also prohibit private actions for damages against a state in federal court.
 619 F.2d at 404 (emphasis added) (footnotes omitted). The clear import of this language is that the State's Eleventh Amendment immunity extends neither to the School District nor to the County.
 
 
 [4]
 The County's reliance on Doe v. Sullivan, 472 F.Supp. 975 (W.D.Tex.1979), is misplaced. The Doe court held El Paso County immune under the Eleventh Amendment on the sole basis of Texas state cases, the most recent decided in 1937, describing Texas counties as arms of the state. This was error. Although a federal court dealing with a federal right is not required to ignore state law, neither is it permitted to ignore federal law; "[m]unicipal defenses--including an assertion of sovereign immunity--to a federal right of action are, of course, controlled by federal law." Owen v. City of Independence, 445 U.S. 622, 647 n. 30, 100 S.Ct. 1398, 1413 n. 30, 63 L.Ed.2d 673 (1980), citing Fitzpatrick v. Bitzer, 427 U.S. 445, 455-56, 96 S.Ct. 2666, 2671-72, 49 L.Ed.2d 614 (1976); see also Monell v. New York City Department of Social Services, 436 U.S. 658, 695 n. 59, 98 S.Ct. 2018, 2038 n. 59, 56 L.Ed.2d 611 (1978) (it has never been the law that state law immunities override Sec. 1983 causes of action). Because Doe failed utterly to include in its analysis the applicable federal cases, most conspicuously, for reasons discussed above, Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), and Avery v. Midland County, Texas, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), we explicitly overrule it
 
 
 [5]
 When the trial court denied the motion, the County considered the matter sufficiently important to pursue an interlocutory appeal to this Court, which affirmed the denial, and then to petition the Supreme Court for a writ of certiorari, which the Court denied. Weber v. Barrett, 450 U.S. 1022, 101 S.Ct. 1729, 68 L.Ed.2d 218 (1981). The County did not, apparently, believe that the Eleventh Amendment presented a bar to its participation in Barrett as a party defendant
 
 
 [6]
 City of Waco v. Bridges, 710 F.2d 220 (5th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1414, 79 L.Ed.2d 741 (1984), is also persuasive authority against the County's position. In that case, McLennan County intervened to assert a claim to money found by two boys. The IRS and the State of Texas also claimed the money. The trial court first rejected the IRS claim, and then held that "as between the State and the County, the money was payable to the County," 710 F.2d at 224; we affirmed the trial court's holding. Waco makes no sense whatsoever if Texas counties can have no property of their own distinct from that of the State
 
 
 [7]
 We note that our finding accords with the position taken in this litigation by the State of Texas which, while not conclusive, is certainly entitled to some weight. See Moor, 411 U.S. at 720-21, 93 S.Ct. at 1801-02. The State maintained that Texas counties are fiscally autonomous, noting that under the Texas Constitution and Texas statute counties "raise revenues through the issuance of bonds, the purchase and sale of property, fees for services, the collection of taxes and fines levied," keep such revenues in the county treasury, and disperse them at the direction of the county commissioners court
 
 
 [8]
 Including, among others, Childress County v. State, 127 Tex. 343, 92 S.W.2d 1011 (1936); Heigel v. Wichita County, 84 Tex. 392, 19 S.W. 562 (1892); City of Galveston v. Posnainsky, 62 Tex. 118 (1886); and Chambers v. Gilbert, 17 Tex.Civ.App. 106, 42 S.W. 630 (Tex.Civ.App.--1897, writ ref'd)
 
 
 [9]
 Texas counties are bodies corporate and public. Tex.Rev.Civ.Stat.Ann. art. 1572 (Vernon 1962). They may sue and be sued, arts. 1573, 1579; O'Quinn v. McVicker, 428 S.W.2d 111, 112 (Tex.Civ.App.--Beaumont 1968, no writ). Texas counties are considered units of local government rather than state agencies, Tex.Const. art. XI, Secs. 1, 3; Tex.Rev.Civ.Stat.Ann. arts. 4413 (32b); 6252-18a(b)(2); 6252-19, Sec. 2(1). They are liable for judgments against them and may levy taxes to pay such judgments, arts. 1575, 6252-19, Sec. 11; County of Brazoria v. Radtke, 566 S.W.2d 326, 328 (Civ.App.--Beaumont 1978, writ ref'd n.r.e.). Texas counties may buy, sell, hold, or otherwise deal in property, arts. 1576, 1577, and may enter into contracts, art. 1578, including contracts for the construction and repair of structures, art. 2307b; County Commissioners Court v. Williams, 638 S.W.2d 218, 222-23 (Tex.App.--Eastland 1982), writ ref'd n.r.e. per curiam, 655 S.W.2d 206 (Tex.1983). They may issue bonds, arts. 1644c-1, 1666a(c); Avery, 390 U.S. at 483, 88 S.Ct. at 1119, and provide a variety of public services, including airports, art. 1581d; flood control, art. 1581e; libraries, art. 1696b; and parks, art. 6081; see Avery, 390 U.S. at 484, 88 S.Ct. at 1120
 
 
 [10]
 Our holding is not inconsistent with Van Ooteghem v. Gray, 654 F.2d 304 (5th Cir.1981) (en banc). In that case, we pretermitted the issue of Texas county entitlement to Eleventh Amendment immunity. On remand, the district court determined that the Eleventh Amendment did not confer immunity on Harris County. 584 F.Supp. 897, 898 (S.D.Tex.1984). It reached this determination by applying to the County the principles established by this Court in Laje, 665 F.2d at 727. We are persuaded by our review of the relevant case law and authorities that the general rule denying Eleventh Amendment immunity to counties and other municipal corporations is sufficiently well established to render application of the Laje criteria unnecessary with regard to such units of local government, absent convincing evidence indicating that the entity in question is indeed atypical, or that the "state treasury" exception to the general rule may apply
 
 
 [11]
 The defendant judges of the Dallas County Criminal Courts joined with Dallas County in claiming entitlement to Eleventh Amendment immunity. Insofar as they sought to derive such immunity from the County, their claim must plainly fail with that of the County. Monell, 436 U.S. at 690 n. 55, 98 S.Ct. at 2035 n. 55. The judges also contend that they are not "persons" under Sec. 1983. The Supreme Court's recent decision in Pulliam v. Allen, --- U.S. ----, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984), settles this question. In Pulliam, an action brought under Sec. 1983, the Court held that judicial immunity bars neither prospective injunctive relief nor the award of attorneys' fees under Sec. 1988. That state judges are "persons" for Sec. 1983 purposes is clearly implicit in this holding. Further, our own cases establish that state court judges are not immune from federal suits seeking equitable or declaratory relief. Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Commissioners, 622 F.2d 807, 813 n. 16 (5th Cir.1980), cert. denied, 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 613 (1981) (Sec. 1983 action against state judges); Sparks v. Duval County Ranch Co., Inc., 604 F.2d 976, 980-81 (5th Cir.1979) (en banc), aff'd sub nom Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980)
 In any event, the ground of the judges' appeal is by no means clear. They have been assessed neither with damages nor with attorneys' fees; no declaratory or injunctive relief has been granted against them. We are thus at a loss as to what the judges are appealing from.
 
 
 [12]
 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)
 
 
 [13]
 A fair reading of the Court's discussion of this point, and one consistent with Mt. Healthy and Lake Tahoe, suggests that the county defendants would have been entitled to Eleventh Amendment immunity only if such immunity were required to protect the state treasury. Pennhurst, --- U.S. at ---- n. 34, 104 S.Ct. at 920-921 n. 34, 79 L.Ed.2d at 93-94 n. 34
 
 
 [14]
 Although the County grounded its argument primarily on Gerstein, it relied also on one paragraph of Smart v. Jones, 530 F.2d 64 (5th Cir.), cert. denied, 429 U.S. 887, 97 S.Ct. 240, 50 L.Ed.2d 168 (1976). In that paragraph, we stated,
 There is no merit to the issues which imply that Deputy Grandstaff initiated this entire altercation by attempting to serve invalid civil process on the plaintiff. The capias, Texas' equivalent to an arrest warrant which is "issued by the court or clerk and directed 'To any peace officer of the State of Texas' " Art. 23.01, Tex.C.Crim.P., was neither improperly executed, nor violative of due process.
 530 F.2d at 66. This language falls far short of affirming the constitutionality of the practices at issue here; the County's reliance on Smart is misplaced.
 
 
 [15]
 This holding, although unaccompanied by supporting citation, appears premised on a line of cases beginning with Roberts v. Williams, 456 F.2d 819 (5th Cir.), cert. denied sub nom. Roberts v. Smith, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971), extending through Sims v. Adams, 537 F.2d 829 (5th Cir.1976), and Howard v. Fortenberry, 723 F.2d 1206 (5th Cir.), vacated in part, 728 F.2d 712 (1984), to, most recently, Craine v. Alexander, 756 F.2d 1070 (5th Cir.1985), in which this Court has stated that breach of a duty imposed by state law must be shown by a plaintiff seeking to impose liability under Sec. 1983. This showing is not required, however, of a plaintiff alleging that defendants were directly responsible for the offending conduct. The distinction is clearly set forth in Sims:
 The language of Sec. 1983 requires a degree of causation as an element of individual liability, but it does not specifically require "personal participation." The proper question is therefore whether the complaint adequately alleges the requisite causal connection between the supervisory defendants' actions and a deprivation of plaintiff's constitutional rights. "Personal participation" is only one of several theories which can be used to establish causation....
 Another theory which includes the requisite causation is that a supervisory defendant is subject to Sec. 1983 liability when he breaches a duty imposed by state or local law, and this breach causes plaintiff's constitutional injury.
 537 F.2d at 831 (emphasis added) (citations and footnote omitted); see Howard, 723 F.2d at 1209 (showing of breach of state-law duty would be required where no defendant was directly responsible for violation).
 These cases thus provide alternative theories for imposition of Sec. 1983 liability: either direct responsibility or breach of a state-law duty. Given the district attorney's direct responsibility for the Dallas County system, it was unnecessary for Crane to prove that he breached a duty imposed by State law.
 
 
 [16]
 A finding that the County District Attorney, the County Judges, and the County Clerk were state officials would therefore, under Pennhurst, deprive the trial court of jurisdiction to render its declaratory judgment that their practices violated state law. Because we conclude that defendants here were officers of the County, not of the State, we need not disturb the trial court's judgment, to which Pennhurst does not apply
 
 
 [17]
 This analysis, which applies as well to the County Judges and the County Clerk, pertains only to suits against the officials in their official capacities. The Eleventh Amendment is obviously no bar to actions for damages against officials sued in their individual capacities; see Wells v. Hutchinson, 499 F.Supp. 174, 204 n. 40 (E.D.Tex.1980); in such actions, defendants must plead and prove the affirmative defense of qualified or "good faith" immunity. See Familias Unidas, 619 F.2d at 403 and n. 12; see also Harlow v. Fitzgerald, 457 U.S. 800, 815-18 and n. 30, 102 S.Ct. 2727, 2738-39 and n. 30, 73 L.Ed.2d 396 (1982)
 Although the matter is not free from doubt, we assume here that defendants were sued in their official capacities. This assumption is grounded both on defendants' assertion of Eleventh Amendment immunity and on the trial court's award of attorneys' fees against the state, pursuant to the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. Sec. 1988. Under that Act, fee awards are "payable by the states when their officials are sued in their official capacities." Hutto v. Finney, 437 U.S. 678, 694, 98 S.Ct. 2565, 2575, 57 L.Ed.2d 522 (1978).
 
 
 [18]
 See also Memorandum Order of September 8, 1982, in which the trial court stated,
 Moreover, though Dallas County changed its system for reasons including 'administrative prudence,' it is clear that Crane's suit challenging the system was a catalyst in effectuating that change.
 Id. at 1-2 (citation omitted) (emphasis added). The conflict between this statement and the trial court's conclusion that the County had no control over its system is obvious and irreconcilable.
 
 
 [19]
 The trial court grounded its finding in part on our statement in Familias Unidas that the duty of a County judge "in implementing section 4.28, much like that of a county sheriff in enforcing a state law, may more fairly be characterized as the effectuation of the policy of the State of Texas embodied in that statute, for which the citizens of a particular county should not bear singular responsibility." 619 F.2d at 404. Thus, because defendants here were "enforcing the state criminal law," 534 F.Supp. at 1245, the trial court found the County immune
 This reading of Familias Unidas ignores two crucial distinctions between that case and this. First, the defendants in Familias Unidas complied with a state statutory scheme later found to be unconstitutional; the error was in the scheme, not in defendants' interpretation of it. Here, defendants failed to comply with a constitutional state statutory scheme; the error was in their interpretation, not in the scheme.
 Second, the statute at issue in Familias Unidas was narrowly drawn, leaving little, if any, room for the exercise of discretion in its implementation. By contrast, the statutes in question here were so drawn as to require the exercise of discretion. The point is clearly made in Familias Unidas: "The narrow authority delegated to the county judge in section 4.28, however, bears no relation to his traditional role in the administration of county government or to the discretionary powers delegated to him by state statute in aid of that role." 619 F.2d at 404 (emphasis added). Familias Unidas cannot thus properly be construed to immunize local governments from Sec. 1983 damage liability for actions within the discretion of their officials which prove to be both unconstitutional and illegal under state law. See Williams v. Thomas, 692 F.2d 1032, 1039-40 (5th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983); Barrett v. Thomas, 649 F.2d 1193, 1201 (5th Cir.1981), cert. denied, 456 U.S. 925, 102 S.Ct. 1969, 72 L.Ed.2d 440 (1982). It stands rather for the unexceptionable proposition that local governments and their officials who act in conformance with a state statutory scheme will not be held liable for Sec. 1983 damages if the scheme is later held unconstitutional. Familias Unidas therefore provides no support for the trial court's finding in this case.
 
 
 [20]
 In any event, it is by no means clear that this point is properly before this Court. The trial court did not ground its finding that the District Attorney was not liable for damages on that officer's qualified, good faith immunity; such immunity is not even mentioned in the trial court's opinion. There would thus appear to be no finding of qualified immunity for Crane to assign as error. The question would be of some importance had we found the instant action to be one against the District Attorney in his individual capacity; it is irrelevant in view of our conclusion that the District Attorney was sued in his official capacity
 
 
 [21]
 Familias Unidas is not to the contrary. In Familias Unidas we stated that the statute in question, to which defendants had conformed their conduct, "obviously represents the official policy of the State." 619 F.2d at 404. The same may be said of the statutes involved in this case. The conduct at issue here, however, violated rather than conformed to those statutes; it would be anomalous indeed to regard as official State policy actions taken by County officials in violation of State law
 
 
 [22]
 Our reversal of the trial court's award of Sec. 1988 attorneys' fees against the State is necessarily predicated on a finding that the award constituted an abuse of the trial court's discretion. Dean v. Gladney, 621 F.2d 1331, 1337 (5th Cir.1980); Morrow v. Dillard, 580 F.2d 1284, 1300 (5th Cir.1978)